Colin C. O'Brien, State Bar No. 309413
Earthjustice
1 Sansome Street, Suite 1700
San Francisco, CA 94104
Tel: 415-217-2000/Fax: 415-217-2040
cobrien@earthjustice.org

*Local Counsel for Plaintiffs Alliance of Nurses
for Healthy Environments et al. (Additional
Plaintiffs and Counsel Listed on Signature Page)*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

ALLIANCE OF NURSES FOR HEALTHY
ENVIRONMENTS, AMERICAN LUNG
ASSOCIATION, AMERICAN PUBLIC HEALTH
ASSOCIATION, AMERICAN THORACIC
SOCIETY, CENTER FOR BIOLOGICAL
DIVERSITY, CITIZENS FOR
PENNSYLVANIA'S FUTURE, CLEAN AIR
COUNCIL, CLEANAIRE NC, CONSERVATION
LAW FOUNDATION, ENVIRONMENTAL
DEFENSE FUND, GEORGIA INTERFAITH
POWER & LIGHT, MICHIGAN
ENVIRONMENTAL COUNCIL, NATURAL
RESOURCES DEFENSE COUNCIL,
NORTHEAST OHIO COMMUNITY
RESILIENCE CENTRE, RIO GRANDE
INTERNATIONAL STUDY CENTER,
SAVANNAH RIVERKEEPER, and SIERRA
CLUB,

       *Plaintiffs*,

      v.

LEE M. ZELDIN, Administrator, United States
Environmental Protection Agency, in his official
capacity,

      *Defendant*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: 3:26-cv-03118-TSH

**PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT**

Date:  May 21, 2026
Time:  10:00 a.m.
Place:  Courtroom E, 15th Floor
Judge:  Magistrate Judge Thomas S. Hixson

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

NOTICE OF MOTION FOR SUMMARY JUDGMENT ................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 2

INTRODUCTION ................................................................................................................. 2

STATEMENT OF ISSUES ..................................................................................................... 2

STATEMENT OF FACTS AND LEGAL FRAMEWORK ............................................................. 3

    I.   Fine Particulate Matter Seriously Harms Human Health. ..................................... 3

    II.  The Clean Air Act Prescribes a Carefully Crafted Program for Controlling
        Particulate Matter Pollution. .............................................................................. 4

    III. EPA Strengthens the Primary Annual $PM_{2.5}$ Standard in 2024. .......................... 6

    IV. EPA Has the Information Necessary to Issue Designations. ................................. 8

    V.  EPA Fails to Promulgate All the Legally Required Designations by the Statutory
        Deadline. ............................................................................................................. 9

JURISDICTION, NOTICE, VENUE, AND STANDING ............................................................. 10

ARGUMENT ...................................................................................................................... 12

    I.   Legal Standard ................................................................................................... 12

    II.  EPA Has Failed to Perform Its Mandatory Duty to Promulgate Designations. ................. 13

    III. The Court Should Require EPA to Complete All Designations Within 150 Days
        of the Court's Order. ........................................................................................... 14

        A.  A court order compelling EPA to act expeditiously is necessary and
            appropriate. ................................................................................................. 15

          1. Such an order is necessary to effectuate the Clean Air Act. ...................... 15

          2. Such an order serves the Act's core purpose of protecting public health. ................. 16

        B.  A 150-day timeframe is appropriate, pragmatic, and reasonable. ............... 18

          1. The statutory period for compliance supports the requested order. ........... 20

          2. A 150-day deadline gives EPA adequate time to finalize designations. .................. 22

          3. A 150-day timeframe is necessary to protect public health. ...................... 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1980) ................................................................................4

*Alaska Ctr. for Env't v. Browner*,
20 F.3d 981 (9th Cir. 1994) .....................................................................14, 19, 21

*Am. Petroleum Inst. v. Costle*,
665 F.2d 1176 (D.C. Cir. 1981) ..............................................................................4

*Am. Trucking Associations v. EPA*,
283 F.3d 355 (D.C. Cir. 2002) ................................................................................4

*American Lung Ass'n v. Browner*,
884 F. Supp. 345 (D. Ariz. 1994) .........................................................................19

*American Lung Ass'n v. EPA*,
134 F.3d 388 (1998)...............................................................................................20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................................12

*Clean Wisc. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) ............................................................................12

*Cmtys. for a Better Env't v. EPA*,
2008 WL 1994898 (N.D. Cal. May 5, 2008) ..................................................14, 19

*Delaney v. EPA*,
898 F.2d 687 (9th Cir. 1990) ................................................................................18

*EPA v. EME Homer City Gen.*,
572 U.S. 489 (2014)...............................................................................................11

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*,
528 U.S. 167 (2000)...............................................................................................11

*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001) ................................................................................11

*Harris v. Bd. of Supervisors, L.A. Cnty.*,
366 F.3d 754 (9th Cir. 2004) ................................................................................18

*Horne v. Flores*,
557 U.S. 433 (2009)........................................................................................................15

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)........................................................................................................11

*Lead Indus. Ass'n v. EPA*,
647 F.2d 1130 (D.C. Cir. 1980).....................................................................................20

*Miss. Comm'n on Envt'l. Quality v. EPA*,
790 F.3d 138 (D.C. Cir. 2015).............................................................................4, 8, 22

*Nat'l Fam. Farm Coal. v. EPA*,
966 F.3d 893 (9th Cir. 2020) .........................................................................................12

*NRDC v. EPA*,
706 F.3d 428 (D.C. Cir. 2013)..........................................................................................5

*NRDC v. Sw. Marine, Inc.*,
236 F.3d 985 (9th Cir. 2000) .........................................................................................21

*NRDC v. Train*,
510 F.2d 692 (D.C. Cir. 1974)..................................................................................13, 19

*NRDC v. Train*,
545 F.2d 320 (2d Cir. 1976)...........................................................................................13

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008)..........................................................................................6

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .........................................................................................14

*In re Ozone Designation Litig.*,
286 F. Supp. 3d 1082 (N.D. Cal. 2018) ...................................................................14, 23

*Physicians for Social Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) .........................................................................................7

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008) .......................................................................................12

*Sierra Club v. Gorsuch*,
551 F. Supp. 785 (N.D. Cal. 1982) ................................................................................23

*Sierra Club v. Thomas*,
658 F. Supp. 165 (N.D. Cal. 1987) ..........................................................................13, 19

*Sierra Club v. Thomas*,
　828 F.2d 783 (D.C. Cir. 1987) .........................................................................................18, 23

*Train v. NRDC*,
　421 U.S. 60 (1975) ...................................................................................................................20

*TVA v. Hill*,
　437 U.S. 153 (1978) .................................................................................................................15

*Union Elec. v. EPA*,
　427 U.S. 246 (1976) .................................................................................................................25

*United States v. McIntosh*,
　833 F.3d 1163 (9th Cir. 2016) .................................................................................................15

*United States v. Oakland Cannabis Buyers' Co-op.*,
　532 U.S. 483 (2001) .................................................................................................................15

*Whitman v. Am. Trucking Ass'ns*,
　531 U.S. 457 (2001) ..............................................................................................................4, 16

*WildEarth Guardians v. EPA*,
　830 F.3d 529 (D.C. Cir. 2016) ..................................................................................................5

**STATUTES**

28 U.S.C. § 1391(e)(1)(A) .................................................................................................................10

28 U.S.C. § 1391(e)(1)(B) .................................................................................................................11

28 U.S.C. § 1391(e)(1)(C) .................................................................................................................10

42 U.S.C. § 7407(d)(1)(A) ..................................................................................................................4

42 U.S.C. § 7407(d)(1)(A)(i) ..............................................................................................................5

42 U.S.C. § 7407(d)(1)(A)(iii) ...........................................................................................................4

42 U.S.C. § 7407(d)(1)(B) ..............................................................................................................2, 4

42 U.S.C. § 7407(d)(1)(B)(i) ...........................................................................................5, 8, 13, 14, 19, 20

42 U.S.C. § 7407(d)(1)(B)(ii) ..........................................................................................4, 5, 9, 19, 21, 22

42 U.S.C. § 7407(d)(2) .......................................................................................................................2

42 U.S.C. § 7407(d)(2)(A) ........................................................................................................4, 13, 20

42 U.S.C. § 7407(d)(2)(B) ................................................................................................................19

42 U.S.C. § 7408(a) ............................................................................................................4

42 U.S.C. § 7409(a)-(b) ......................................................................................................4

42 U.S.C. § 7409(d)(1) ........................................................................................................4

42 U.S.C. § 7410(a) .........................................................................................................5, 6

42 U.S.C. § 7410(a)(2)(D)(i) ..............................................................................................6

42 U.S.C. § 7410(c) ............................................................................................................5

42 U.S.C. § 7471 ................................................................................................................4

42 U.S.C. § 7475(a)(4) ........................................................................................................5

42 U.S.C. §§ 7502-7503......................................................................................................16

42 U.S.C. § 7502(b) ............................................................................................................6

42 U.S.C. § 7502(c)(1)........................................................................................................5

42 U.S.C. § 7503(a)(1)(A) ..................................................................................................5

42 U.S.C. § 7503(a)(2).........................................................................................................5

42 U.S.C. §§ 7513-7513b.....................................................................................................5

42 U.S.C. § 7513(c) .......................................................................................5, 16, 21, 24

42 U.S.C. § 7513(c)(1).........................................................................................................19

42 U.S.C. § 7513a(a)(2)(B).......................................................................................6, 16, 19, 21

42 U.S.C. § 7601(d)(1).........................................................................................................4

42 U.S.C. § 7602(d) ............................................................................................................4

42 U.S.C. § 7602(e) ............................................................................................................10

42 U.S.C. § 7604(a) .....................................................................................1, 10, 15, 16

42 U.S.C. § 7604(a)(2).........................................................................................................1

42 U.S.C. § 7604(b)(2).........................................................................................................10

42 U.S.C. § 7607(b)(1).......................................................................................................8, 14

**REGULATIONS**

40 C.F.R. § 50.14 ................................................................................................................9

40 C.F.R. § 50.20(b) ...........................................................................................................8

40 C.F.R. pt.50, App.N ........................................................................................................8

40 C.F.R. § 51.1003(a)(2) ..........................................................................................6, 16, 21

40 C.F.R. § 51.1004(a)(1) .................................................................................................18, 21

40 C.F.R. § 54.2(d) ............................................................................................................10

40 C.F.R. § 58.15(a)-(b) ......................................................................................................9

**FEDERAL REGISTER NOTICES**

80 FR 2206 (Jan. 15, 2025) ...............................................................................................20

88 FR 5558 (Jan. 27, 2023) ...........................................................................................7, 17

89 FR 16202 (Mar. 6, 2024) .....................................................................................3, 6, 7, 13

89 FR 42874 (May 16, 2024) .............................................................................................23

89 FR 103652 (Dec. 19, 2024) .......................................................................................6, 14

**COURT RULES**

Civ. L.R. 56-1 ....................................................................................................................1

Fed. R. Civ. P. 56 ...............................................................................................................1

Fed. R. Civ. P. 56(a) ..........................................................................................................12

Fed. R. Civ. P. 56(c)(1)(A) .................................................................................................12

**NOTICE OF MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on May 21, 2026, at 10:00 a.m., before the Honorable Magistrate Judge Thomas S. Hixson in Courtroom E, 15th Floor, Plaintiffs Alliance of Nurses for Healthy Environments, American Lung Association, American Public Health Association, American Thoracic Society, Center for Biological Diversity, Citizens for Pennsylvania's Future, Clean Air Council, CleanAIRE NC, Conservation Law Foundation, Environmental Defense Fund, Georgia Interfaith Power & Light, Michigan Environmental Council, Natural Resources Defense Council, Northeast Ohio Community Resilience Centre, Rio Grande International Study Center, Savannah Riverkeeper, and Sierra Club (collectively, "Plaintiffs" or "Health, Environmental, and Community Groups") will and hereby do move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56-1. This motion is based on the points and authorities below, the attached declarations and exhibits, the record of this action, and argument that may be presented at the hearing on this motion.

**MOTION FOR SUMMARY JUDGMENT**

To begin the process of alleviating harmful levels of unhealthy fine particulate matter air pollution, Defendant, the Administrator of the U.S. Environmental Protection Agency ("the Administrator" or "EPA"), had a mandatory duty under the Clean Air Act to promulgate initial area air quality designations under the 2024 fine particulate matter national ambient air quality standard for all areas of the country by February 7, 2026. EPA did not fulfill this duty. There is no genuine dispute as to any material fact, and Plaintiffs are entitled to and request summary judgment as a matter of law on the question of liability. Health, Environmental, and Community Groups respectfully request that this Court: (1) declare that EPA's failure to complete its mandatory duty to promulgate those designations, through publication in the Federal Register, constitutes an unlawful failure to perform a nondiscretionary act or duty under the Clean Air Act, 42 U.S.C. § 7604(a)(2); and (2) to effectuate the overdue protections required under the Clean Air Act to limit the serious health harms fine particulate matter air pollution causes to their members and the public, issue a mandatory injunction compelling EPA to, no later than 30 days from the date of this Court's order, send 120-day notice letters to states and Tribes for any areas

for which EPA proposes to modify a recommended designation, and, within 150 days of the Court's order, promulgate immediately effective final designations of all areas of the country through publication in the Federal Register.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This is a straightforward mandatory duty lawsuit to drive a fundamental Clean Air Act protection for human health forward after EPA has dragged its feet. To initiate the Act's mechanisms for reducing deadly fine particulate matter air pollution (also known as "PM$_{2.5}$"), EPA was legally required to designate all areas of the country as meeting or not meeting the updated health-protective standard for PM$_{2.5}$ pollution no later than February 7, 2026. It has not done so. Indeed, it has not designated any of the communities with PM$_{2.5}$ pollution levels that violate the standard. Those designations would trigger a suite of mandatory actions to reduce emissions contributing to unhealthy air quality—actions that EPA estimated would save thousands of lives annually and prevent chronic debilitating conditions including lung cancer, cardiovascular disease, asthma, and Alzheimer's disease. Thus, EPA's delay seriously endangers the health and wellbeing of millions of people who breathe unhealthily polluted air. A coalition of 17 Health, Environmental, and Community Groups respectfully requests that this Court establish an expeditious schedule for EPA to do its job and comply with the Act.

## STATEMENT OF ISSUES

1. Has EPA failed to promulgate the initial area air quality designations, through publication in the Federal Register, for all areas of the country under the 2024 primary annual fine particulate matter standard by the February 7, 2026, deadline, as required by 42 U.S.C. § 7407(d)(1)(B) & (d)(2)(A)?

2. By when must EPA take final action to promulgate the designations through publication in the Federal Register and make those designations effective to complete this overdue mandatory duty and remedy the harms its delay has caused?

## STATEMENT OF FACTS AND LEGAL FRAMEWORK

**I.    FINE PARTICULATE MATTER SERIOUSLY HARMS HUMAN HEALTH.**

Fine particulate matter—airborne particles under 2.5 microns in diameter—is an air pollutant that enters the respiratory system and can then spread to different parts of the body. Integrated Science Assessment for Particulate Matter, EPA-HQ-OAR-2015-0072-0212, at 4-2 to -3, 4-55 to -56 (Dec. 2019), Ex.1 ("2019 Science Assessment"). Exposure to $PM_{2.5}$ pollution causes premature death and sends people to the hospital and emergency department. 89 FR 16202, 16203/3 (Mar. 6, 2024). Specifically, $PM_{2.5}$ pollution results in death, serious cardiovascular harms (like heart attacks and heart disease), respiratory harms (like asthma attacks and development of diseases like asthma and chronic obstructive pulmonary disease), neurological harms (like dementia and Alzheimer's disease), and lung cancer. 2019 Science Assessment ES-12 to -16, ES-22 to -23, 1-21 to -30, 1-33 to -38 tbl.1-2, 5-1 to -220, 6-1 to -223, 8-1, 8-17 to -61, 10-1 to -77, 11-1 to -102. Though healthy adults can experience these harms, children, older adults, and people with preexisting heart or lung disease are at greater risk. 89 FR 16234/3-35/3; Limaye Decl. ¶¶ 15, 19, Ex.13. There is no threshold concentration below which $PM_{2.5}$ causes no harm: any amount of $PM_{2.5}$ in the air is unhealthy. 89 FR 16238/3, 16254/2; Supplement to the 2019 Integrated Science Assessment for Particulate Matter, EPA-HQ-OAR-2015-0072-1585, at 2-29 to -31 (May 2022), Ex.2; 2019 Science Assessment ES-23; Limaye Decl. ¶ 20.

Exposure to and harm from $PM_{2.5}$ are not evenly distributed. Black and Hispanic populations "on average, experience higher $PM_{2.5}$ exposures and $PM_{2.5}$-related health risks than non-Hispanic White populations." 89 FR 16204/1. These disparities cause higher rates of $PM_{2.5}$-associated hypertension and mortality in these populations. *Id.* 16235/3. Lower income communities are also often exposed to higher concentrations of $PM_{2.5}$ and experience greater risks of $PM_{2.5}$-related health outcomes. *Id.* 16375/2.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-cv-03118-TSH                                                                                    3

## II.     THE CLEAN AIR ACT PRESCRIBES A CAREFULLY CRAFTED PROGRAM FOR CONTROLLING PARTICULATE MATTER POLLUTION.

At the "heart" of the Clean Air Act is the requirement that the entire country come expeditiously into compliance with health- and welfare-protective air quality standards. *Alabama Power Co. v. Costle*, 636 F.2d 323, 346 (D.C. Cir. 1980). EPA must set "primary" and "secondary" standards for certain pervasive pollutants, like particulate matter, to protect public health and welfare, respectively. 42 U.S.C. §§ 7408(a), 7409(a)-(b). It must review and, as appropriate, update these standards at least every five years. *E.g.*, *id.* § 7409(d)(1). In setting and updating standards, EPA may not consider implementation costs or technological feasibility. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 & n.4 (2001); *Am. Petroleum Inst. v. Costle*, 665 F.2d 1176, 1185 (D.C. Cir. 1981). Only primary standards are at issue here.

After EPA sets a standard, the Act prescribes a step-by-step implementation process, with initial area air quality designations being the key first step. *See Am. Trucking Associations v. EPA*, 283 F.3d 355, 358-59 (D.C. Cir. 2002). Within one year of promulgation, states must submit any recommended designations to EPA. 42 U.S.C. § 7407(d)(1)(A).[1] Then, "as expeditiously as practicable," but no later than two years after promulgating a standard, EPA "shall promulgate the designations of all areas (or portions thereof)" as either violating the standard ("nonattainment" areas) or meeting the standard ("attainment" areas). *Id.* § 7407(d)(1)(B).[2] The promulgation must occur through publication of a notice in the Federal Register. *Id.* § 7407(d)(2)(A) ("The Administrator shall publish a notice in the Federal Register promulgating any designation under [§ 7407(d)(1)]"). This duty applies even if a state fails to submit a recommendation. *Id.* § 7407(d)(1)(B)(ii). EPA may modify a recommended

---

[1] Tribes, the District of Columbia, and several U.S. territories are treated as states for this purpose. *See id.* §§ 7601(d)(1), 7602(d).

[2] There is a third designation—an "unclassifiable" area, which is "any area that cannot be classified on the basis of available information as meeting or not meeting" the standard—which is treated for regulatory purposes as an attainment area. 42 U.S.C. §§ 7407(d)(1)(A)(iii), 7471; *see also Miss. Comm'n on Envt'l. Quality v. EPA*, 790 F.3d 138, 145 (D.C. Cir. 2015) (describing "unclassifiable" designation).

---

designation, but must provide the state 120 days' notice and give the state an opportunity to rebut the proposed modification (referred to herein as "120-day notice letters"). *Id.* § 7407(d)(1)(B)(ii). The Act allows EPA to extend its deadline for promulgating designations for a limited time, but only when it "has insufficient information to promulgate the designations." *Id.* § 7407(d)(1)(B)(i).

The Act specifies the relevant considerations for establishing designations by specifically defining each type of area. For example, a nonattainment area is one that "does not meet (or that contributes to ambient air quality in a nearby area that does not meet)" a standard for a pollutant. *Id.* § 7407(d)(1)(A)(i). The designation of an area is especially important because it determines the stringency of the on-the-ground protections against pollution under the Act.

Congress created a detailed program to ensure that nonattainment areas comply with particulate matter standards by specified deadlines ("attainment deadlines"). *Id.* §§ 7410(a), (c), 7502; *see also id.* §§ 7513-7513b (provisions specific to particulate matter nonattainment areas).[3] For example, Congress mandated that more stringent air permitting requirements apply in areas designated as nonattainment. New or modified major sources of $PM_{2.5}$ pollution must offset their new $PM_{2.5}$ emissions and meet the "lowest achievable emission rate" for $PM_{2.5}$ emissions, *id.* § 7503(a)(1)(A), (a)(2), rather than the otherwise applicable, less stringent "best available control technology," *id.* § 7475(a)(4). And existing sources in nonattainment areas must implement "reasonably available control measures" including the adoption of "reasonably available control technology." *Id.* § 7502(c)(1).

Crucially, the Act-mandated attainment deadlines are keyed to the date of designation. *See* 42 U.S.C. § 7513(c); *WildEarth Guardians v. EPA*, 830 F.3d 529, 532 (D.C. Cir. 2016). Similarly, other mandatory nonattainment area requirements depend on the designation date. Each state must adopt a "state implementation plan" that, for nonattainment areas, includes all

---

[3] Sections 7513-7513b, collectively comprising Subpart 4 of Part D of Title I of the Act, refer to "PM-10" but, because $PM_{2.5}$ is a subset of PM-10, govern nonattainment requirements for $PM_{2.5}$. *NRDC v. EPA*, 706 F.3d 428, 435 (D.C. Cir. 2013) ("[B]y its express terms, Subpart 4, when enacted, governed all $PM_{10}$ particles, including those now denominated $PM_{2.5}$.").

the mandatory pollution control requirements as well as any specific measures that the state decides should be implemented to address local sources of air pollution contributing to elevated PM$_{2.5}$ levels. *Id.* §§ 7410(a), 7502(b). The deadlines for states to submit plans adopting these specific pollution control programs depend on the areas first being designated nonattainment and run from the date of designation. *See, e.g.*, *id.* §§ 7502(b), 7513a(a)(2)(B) (states must submit attainment plans within 18 months of designation); *see also* 40 C.F.R. § 51.1003(a)(2) (states must submit attainment plans within 18 months of the designation effective date).

The designations are also relevant to other Clean Air Act protections. For example, designations affect the timing of emission reductions required by rules implementing the Act's "Good Neighbor Provision," which requires states (or, if a state fails to act on time, EPA) to prohibit emissions that "contribute significantly to nonattainment in" downwind states. 42 U.S.C. § 7410(a)(2)(D)(i), (c); *see North Carolina v. EPA*, 531 F.3d 896, 911-12, *amended in other part on reh'g*, 550 F.3d 1176 (D.C. Cir. 2008).

EPA's promulgation of nonattainment designations is thus essential to triggering the Act's nonattainment provisions and bringing about the associated health benefits. Simply put, delay of designations delays the stronger pollution controls Congress mandated to protect people in communities with unhealthy air.

**III.     EPA STRENGTHENS THE PRIMARY ANNUAL PM$_{2.5}$ STANDARD IN 2024.**

EPA updated the PM$_{2.5}$ standards on February 7, 2024, strengthening the primary annual standard from 12.0 µg/m³ to 9.0 µg/m³ after a detailed review of the scientific evidence. Memorandum on Initial Area Designations for the 2024 Revised Primary Annual Fine Particle National Ambient Air Quality Standard, from Joseph Goffman, Ass't Adm'r, to Reg'l Adm'rs (Feb. 7, 2024), Ex.3 ("Memorandum"); 89 FR 16202/1 (Federal Register publication).[4]

---

[4] While publication in the Federal Register did not occur until March 7, 2024, EPA acknowledged that in the national ambient air quality standard ("NAAQS") setting process, a standard is promulgated upon signature and release to the public. 89 FR 16366/1 (citing *API* v. *Costle*, 609 F.2d 20 (D.C. Cir. 1979)). Signature and release to the public occurred on February 7, 2024. 89 FR 103652, 103653/1 (Dec. 19, 2024) ("EPA promulgated (signed and made available on the EPA's website) the reconsideration of the PM$_{2.5}$ NAAQS on February 7, 2024").

EPA undertook this detailed review out of a concern that the existing 2012 standards were not adequate to protect public health and to address procedural flaws in its 2020 review of the standards. *See* 89 FR 16210/2-13/3 (describing reconsideration decision and process); *Physicians for Social Resp. v. Wheeler*, 956 F.3d 634, 644-49 (D.C. Cir. 2020) (EPA's advisory committee policy used in the 2020 review was arbitrary and unlawful). EPA ultimately strengthened the standard in 2024 because the extensive scientific record established that individuals experience negative health effects from $PM_{2.5}$ exposures at levels allowed by the 2012 standards, including higher mortality and cardiovascular-related hospital admissions. *See* 88 FR 5558, 5581/1-83/2, 5604/1, 5607/1-2, 5608/2 (Jan. 27, 2023).

EPA projected that compliance with the strengthened 2024 standard will lead to significant public health benefits. EPA estimated that, in 2032, the new standard will lead to 4,500 fewer premature deaths, 290,000 fewer lost workdays, 800,000 fewer cases of asthma symptoms, and 1,990 fewer emergency department visits, among other health benefits. *Final Regulatory Impact Analysis for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, EPA-HQ-OAR-2019-0587-0279, at 17 tbl.ES-6 (Jan. 2024), Ex.4 ("RIA"). The economic value of these benefits significantly outweighs the cost of achieving them, with net benefits in 2032 estimated to be between $22 billion and $46 billion. *Id.* 26, 27 tbl.ES-10.

Soon after EPA promulgated the 2024 standard, industry groups and some states filed petitions for review requesting vacatur of the new standard. *Kentucky v. EPA*, No. 24-1050 (D.C. Cir. Mar. 6, 2024). Other states and environmental and public health groups, including several Plaintiffs, intervened in defense of the rule. *See, e.g.*, Unopposed Mot. to Intervene, *Kentucky v. EPA*, No. 24-1050 (D.C. Cir. Mar. 27, 2024). No party sought a stay, and the case was briefed and argued in 2024. In November 2025, without notice or public input, or disputing the overwhelming scientific evidence supporting the strengthened standard, EPA reversed its position defending the 2024 standard and requested that the court vacate the standard prior to the February 7, 2026, designation deadline. Resp'ts' Mot. for Vacatur 1, *Kentucky v. EPA*, No. 24-1050 (D.C. Cir. Nov. 24, 2025). Respondent-Intervenors forcefully opposed this motion. *See,*

*e.g.*, Health, Environmental, and Community Group Resp't-Intervenors' Resp. in Opp. & Cross-Mot., *Kentucky v. EPA*, No. 24-1050 (D.C. Cir. Dec. 16, 2025). The D.C. Circuit has not yet ruled on this motion or on the merits of the case, and the 2024 standard and all implementation deadlines remain in full effect. *See* 42 U.S.C. § 7607(b)(1) (the filing of a petition for judicial review "shall not postpone the effectiveness of such rule or action.").

**IV.    EPA HAS THE INFORMATION NECESSARY TO ISSUE DESIGNATIONS.**

EPA updated the standard on February 7, 2024, meaning its mandatory deadline for issuing designations was February 7, 2026. *See* 42 U.S.C. § 7407(d)(1)(B)(i). EPA has long had a process in place for issuing, as well as the necessary information to issue, designations by this date.

On the same day it promulgated the updated standard, EPA published a memorandum detailing the process and timeline for developing designations. *See generally* Memorandum. As with prior PM$_{2.5}$ standards, designations are based on three-year averages of PM$_{2.5}$ levels, called "design values," from a national network of regulated, official air quality monitoring stations. *Id.* 3, Att.3 at 4-5; *see also* 40 C.F.R. § 50.20(b); *id.* pt.50, App.N, § 4.1; Graham Decl. ¶¶ 11-12, Ex.12. An area must be designated as nonattainment if it violates the standard—meaning that the design value exceeds the standard—or contributes to a violation of a standard in a nearby area. Memorandum 3 (citing 42 U.S.C. § 7407(d)(1)). EPA explained that after identifying a violation, it would use a time-tested five-factor approach to determine "what nearby areas contribute to the violation(s)" and establish additional nonattainment areas. *Id.* 5, Att.3 (providing guidance on these five factors), Att.3 at 1 (explaining that these factors were derived from ozone designations, but were similar to the factors used in prior PM$_{2.5}$ designations); *see also Miss. Comm'n*, 790 F.3d at 149, 158-59 (upholding EPA's use of the same five-factor test).

The necessary information to undertake this process has long been available. The 2023 design values—used by states to issue recommendations—were published in August 2024, and the 2024 design values—which EPA planned to use for issuing final designations—were published in early June 2025. Memorandum 2-3; EPA, *Air Quality Design Values*,

https://www.epa.gov/air-trends/air-quality-design-values (last updated Aug. 28, 2025), Ex.5.[5] EPA and states thus had the relevant data long before the designations deadlines. Accordingly, 45 states, D.C., Puerto Rico, the U.S. Virgin Islands, and 3 Tribes submitted designation recommendations to EPA.[6] Winz Decl. ¶ 13, Ex.14.

EPA's memorandum also outlined that pursuant to its rule allowing for the exclusion of air monitoring data impacted by "exceptional events"—specific unpreventable emission events that cause air pollution exceedances—states had until February 7, 2025, to submit exceptional event demonstrations for 2021-2023, and until September 30, 2025, to submit exceptional event demonstrations for 2024. Memorandum 4, Att.2 at 1; *see also* 40 C.F.R. § 50.14. Records EPA released show 25 states and 2 Tribes have submitted exceptional event demonstrations for 2022-2024. Winz Decl. ¶ 19. EPA has processed and issued responses for half of these. *Id.* ¶ 20.

In sum, long before EPA's deadline to issue designations, EPA had established procedures for developing designations, published the relevant design values in a timely manner based on certified, quality-assured monitoring data, received recommendations and/or exceptional event demonstrations from the vast majority of states, and responded to many of those exceptional event demonstrations. EPA accordingly had all the information it needed to issue designations under the 2024 standard by its February 7, 2026, deadline.

## V.    EPA FAILS TO PROMULGATE ALL THE LEGALLY REQUIRED DESIGNATIONS BY THE STATUTORY DEADLINE.

February 7, 2026, has come and gone without EPA promulgating any designations under the 2024 $PM_{2.5}$ standard. EPA has not even issued any 120-day notice letters notifying states of EPA's intention to modify any designation recommendations. As a result, every county in the United States remains undesignated, including areas that states recommended designating nonattainment and the 125 counties that had 2023 or 2024 design values above the 2024

---

[5] States must submit certified 2025 air monitoring data—used in calculating 2025 design values—by May 1, 2026. 40 C.F.R. § 58.15(a)-(b).

[6] The Act requires EPA to designate areas even where no state or Tribe recommendation has been made. 42 U.S.C. § 7407(d)(1)(B)(ii).

---

standard. *See* Graham Decl. ¶¶ 13-14. Plaintiffs have members who live in each of these 125 counties. *See, e.g.*, Olinger Decl. ¶ 5, Ex.53; Stith Decl. ¶ 6, Ex.62. And other undesignated areas likely contribute to violations of the 2024 standard in other counties. *See, e.g.*, *Responses to Significant Comments on the State and Tribal Designation Recommendations for the 2012 Annual PM$_{2.5}$ NAAQS*, EPA-HQ-OAR-2012-0918-0337, at 29-30 (Dec. 17, 2014), Ex.6; Graham Decl. ¶ 22.

EPA's delay in promulgating designations means that the people living, working, and enjoying outdoor activities in these areas are deprived of Clean Air Act protections specifically designed to reduce particulate matter pollution and protect their health.

### JURISDICTION, NOTICE, VENUE, AND STANDING

This Court has jurisdiction under the Clean Air Act's citizen suit provision, which authorizes district courts to hear actions brought by "any person" to compel EPA to perform "any act or duty" under the Act "which is not discretionary." 42 U.S.C. § 7604(a), (a)(2); *see also id.* § 7602(e) (defining "person"). EPA's failure to promulgate initial area air quality designations under the 2024 standard for all areas of the country by February 7, 2026, is a failure to perform an action that is not discretionary, as explained herein.

Plaintiffs satisfied the notice requirements for bringing this action. *See* Letter to EPA Administrator Lee M. Zeldin (Feb. 10, 2026), Ex.7. More than 60 days have passed since the notice was provided, and EPA has continued its failure to fulfill its mandatory duty. *See* 42 U.S.C. § 7604(b)(2); 40 C.F.R. § 54.2(d).

Venue is proper in this Court because Plaintiff Sierra Club is headquartered in Oakland and thus resides in this district and this district is one in which EPA resides and performs its official duties. 28 U.S.C. § 1391(e)(1)(A), (C). Venue is also proper because (1) a substantial part of the events and omissions giving rise to this claim occurred and is occurring in this district because EPA failed to promulgate all designations for this district; (2) the health and welfare of district residents, including members of Health, Environmental, and Community Groups, *see, e.g.*, Olinger Decl. ¶ 5(i), (p), (y), are threatened by EPA's failure to make designations; and (3)

EPA's Regional Office in San Francisco, California, has a substantial role in implementing the duty at issue. 28 U.S.C. § 1391(e)(1)(B); *see* Memorandum 1, 4, Att.1 at 1.

Health, Environmental, and Community Groups have standing to bring this suit because their members would have standing to sue in their own right, their interest in safeguarding public health and the environment is germane to their organizational purposes, and this suit will not require individual participation of members. Declarations, Exs.15-65; *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As discussed more fully below, at pp.16-18, Plaintiffs have members who live, work, recreate, worship, and carry out other activities in areas where recent official EPA measurements report harmful levels of fine particulate matter pollution, but where EPA has not yet promulgated designations. *See* Declarations, Exs.12, 15-65. Such particulate pollution endangers the health of their members and their members' families, and diminishes members' enjoyment of their outdoor activities by causing them to limit the time they spend outdoors. *See id.* Promulgation of designations is necessary to start the process of bringing particulate pollution levels down to comply with the standard EPA says is necessary to protect public health with an adequate margin of safety. *See supra* pp.4-6. Plaintiffs' members in areas that do not violate the 2024 standard also experience harms from existing fine particulate matter pollution that designations will help alleviate. As explained above, any level of fine particulate matter pollution can cause health harms. Further, fine particulate matter can be transported long distances. *See, e.g.*, *EPA v. EME Homer City Gen.*, 572 U.S. 489 (2014) (considering EPA rule governing interstate transport of fine particulate matter); Graham Decl. ¶ 23. Thus, designations will bring the level of fine particulate matter pollution down not only in areas designated nonattainment but also in downwind areas, and this will benefit Plaintiffs' members. *See, e.g.*, Limaye Decl. ¶ 23.

Accordingly, Health, Environmental, and Community Groups have standing to bring this suit. *E.g.*, *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 181-84 (2000) (environmental group has standing where members use area impacted by pollutant discharges and aver reasonable concerns about the effects of those discharges on their recreational, aesthetic, and economic interests); *Hall v. Norton*, 266 F.3d 969, 973-74, 976 (9th Cir. 2001)

(individual has standing where he faces a threat of harm from air pollution when traveling, shopping, and carrying out other activities in polluted area); *see also Clean Wisc. v. EPA*, 964 F.3d 1145, 1157-58 (D.C. Cir. 2020) ("more ozone is more ozone, and there is no threshold concentration below which ground-level ozone is known to be harmless" (cleaned up)).

EPA's failure to timely promulgate designations further injures Plaintiffs and their members by depriving them of procedural opportunities to protect these concrete interests. The Act's procedure for promulgating all area designations by a fixed deadline is designed to protect Plaintiffs' members' concrete interests in breathing clean air. *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229-30 (9th Cir. 2008) (environmental group had standing where agency violated procedural requirement designed to protect group's concrete interests in welfare of endangered species); *see also Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020) (same). As described above, EPA's continuing failure to complete designations postpones attainment deadlines and required steps to reduce unsafe levels of pollution, thereby prolonging Plaintiffs' members' exposure to harmful $PM_{2.5}$ pollution. Moreover, EPA's failure to complete the designations process deprives Plaintiffs and their members of their procedural right to judicially challenge final designations that they contend are unlawful or arbitrary. An order compelling EPA to make the designations by a date certain will redress the foregoing injuries.

## ARGUMENT

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when, viewing the facts in the light most favorable to the nonmoving party, the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to cite "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *accord* Fed. R. Civ. P. 56(c)(1)(A).

In ordering appropriate relief, a district court should compel EPA to correct its statutory violations as soon as possible. *NRDC v. Train*, 510 F.2d 692, 705, 712-13 (D.C. Cir. 1974). Where there is a clear statutory deadline, EPA bears the especially "heavy" burden of proving that expeditious compliance would be "impossible." *Sierra Club v. Thomas*, 658 F. Supp. 165, 170-71 (N.D. Cal. 1987) (citing *Train*).

## II.   EPA HAS FAILED TO PERFORM ITS MANDATORY DUTY TO PROMULGATE DESIGNATIONS.

EPA had a mandatory duty under the Clean Air Act to promulgate designations of all areas in each state under the standard through publication in the Federal Register no later than February 7, 2026. It failed to do so.

Congress commanded that, after changing a national ambient air quality standard, EPA "shall promulgate the designations of all areas (or portions thereof) [in each state] as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard," permitting up to a one-year extension only "in the event the Administrator has insufficient information to promulgate the designations." 42 U.S.C. § 7407(d)(1)(B)(i); *see also* 89 FR 16366/1 (EPA acknowledgment of this statutory requirement). Congress further specified that EPA "shall publish a notice in the Federal Register promulgating any designation under" § 7407(d)(1), thus requiring EPA to promulgate these designations by publication in the Federal Register. 42 U.S.C. § 7407(d)(2)(A). Thus, Congress plainly mandated that EPA must promulgate designations under an updated standard via publication of a notice in the Federal Register, and that EPA must make such publication no later than two years after EPA promulgates the updated standard.

The duty to promulgate all designations through publication in the Federal Register by the precise deadline set forth in the Act is non-discretionary. *See NRDC v. Train*, 545 F.2d 320, 324-25, 327 (2d Cir. 1976) (holding that EPA had non-discretionary duty under Clean Air Act where statute used the "mandatory" term "shall" and included "a specific timetable" for attainment of air quality standards). Moreover, EPA has repeatedly conceded that it was required to promulgate the designations by the two-year deadline. *See, e.g.*, Resp'ts' Mot. for Vacatur 1,

*Kentucky v. EPA*, No. 24-1050 (D.C. Cir. Nov. 24, 2025) (acknowledging an "area designation deadline of February 7, 2026").

These mandatory designations for the standard are overdue. EPA promulgated the standard on February 7, 2024, which made the promulgation of all area designations due no later than two years from that date, on February 7, 2026. *See* 42 U.S.C. § 7407(d)(1)(B)(i); 89 FR 103653/1. The standard and associated mandatory duty to designate areas remain in effect notwithstanding ongoing litigation. 42 U.S.C. § 7607(b)(1). EPA has not taken any actions to promulgate designations or extend that deadline. EPA's failure to complete all area designations is continuing. These facts are beyond dispute.

Because it is undisputable that EPA has not promulgated through publication in the Federal Register all area designations for the standard by the statutory deadline or to date—a nondiscretionary duty mandated by the Clean Air Act—EPA has plainly violated the law, and Health, Environmental, and Community Groups are entitled to summary judgment finding EPA liable for violating the law.[7]

**III.    THE COURT SHOULD REQUIRE EPA TO COMPLETE ALL DESIGNATIONS WITHIN 150 DAYS OF THE COURT'S ORDER.**

The Court has "broad latitude" to fashion an equitable remedy, particularly where the public interest is involved. *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994); *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680 (9th Cir. 2007). And when EPA has indisputably failed to perform its mandatory duty to issue designations, the Court may craft an "appropriate equitable remedy…in its discretion." *In re Ozone Designation Litig.*, 286 F. Supp. 3d 1082, 1084 (N.D. Cal. 2018). Such a remedy may include interim deadlines that are not statutorily required to prevent agencies from escaping duties "simply by procrastinating." *Cmtys. for a Better Env't v. EPA*, 2008 WL 1994898, at *3 (N.D. Cal. May 5, 2008) (internal citations omitted).

---

[7] To the extent that EPA is subject to two distinct duties—one to promulgate and the other to publish notice in the Federal Register promulgating the designations—EPA has violated both for the reasons given above.

Plaintiffs request that the Court issue a mandatory injunction compelling EPA to: (1) within 30 days of the Court's order send 120-day notice letters to states and Tribes for any areas for which EPA proposes to modify a recommended designation; (2) within 150 days of the Court's order promulgate designations through publication in the Federal Register; and (3) make those designations effective immediately.[8] Such a request is within the Court's authority and discretion, and is necessary to effectuate the Clean Air Act and protect people's health, is appropriate in light of statutory deadlines, and gives EPA adequate time to finalize designations.

### A. A court order compelling EPA to act expeditiously is necessary and appropriate.

### 1. Such an order is necessary to effectuate the Clean Air Act.

Because Congress specified precisely what EPA must do and EPA has not done it, this Court must issue an order requiring EPA to complete its duty forthwith. 42 U.S.C. § 7604(a) (expressly empowering district courts "to order the Administrator to perform such [an unlawfully withheld] act or duty"); *see also TVA v. Hill*, 437 U.S. 153, 173 (1978); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016). "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when enforcement is sought. Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (internal citation and quotation and alteration marks omitted); *see also Horne v. Flores*, 557 U.S. 433, 450 (2009) ("It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief.").

Such an order is necessary to prevent EPA from thwarting the Clean Air Act. As fully discussed above, Congress has expressly commanded that EPA promulgate initial area air quality designations as expeditiously as practicable and no later than two years after promulgating an updated national ambient air quality standard, except under particular, limited circumstances

---

[8] Plaintiffs reserve the right to modify this requested relief as warranted by a change in circumstances.

allowing an extension of up to a year—circumstances upon which EPA does not claim to rely, and which it could not in good faith invoke. EPA's failure to comply with this clear command nullifies swaths of the Act. To ensure public health would be protected, Congress laid out a precise system for implementation of particulate matter standards. *See* 42 U.S.C. §§ 7502-7503 (general provisions for nonattainment areas), 7513-7513b (provisions specifically for particulate matter nonattainment areas). Deadlines—both for adopting the programs Congress specifically required and for ultimately attaining the standards—depend on areas first being designated nonattainment and the date they are so designated. *See* 42 U.S.C. §§ 7513(c) (establishing attainment deadlines for nonattainment areas based on designation dates), 7513a(a)(2)(B) (attainment plans due within 18 months of designation); *see also* 40 C.F.R. § 51.1003(a)(2) (attainment plans due within 18 months of the designation effective date).

Thus, the Congressionally-crafted framework for improving air quality and public health begins operating in earnest—and other statutory deadlines can be determined—only once EPA completes its task of promulgating initial area air quality designations.

By refusing to promulgate those designations, EPA unlawfully nullifies Congress's carefully conceived mechanism for improving air quality and public health. *Cf. Whitman*, 531 U.S. at 485 ("EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion."). The Act explicitly gives district courts authority "to order the Administrator to perform such [an unlawfully withheld] act or duty." 42 U.S.C. § 7604(a). A court order is thus authorized and needed to prevent Congress's mandate from being disregarded.

**2.  Such an order serves the Act's core purpose of protecting public health.**

So long as EPA fails to make designations, it delays pollution controls the Act requires to reduce unsafe particulate matter levels in communities where Health, Environmental, and Community Groups' members live, work, worship, and enjoy recreation. EPA's failure to act means that areas with fine particulate matter levels that violate the 2024 standard, or that contribute to a violation, will not be timely designated as nonattainment and thus will lack the anti-pollution protections that a nonattainment designation would accord them, as just explained.

These important protections include measures states adopt into their implementation plans to sufficiently limit emissions of fine particulate matter for the area to come into attainment, as well as attainment deadlines, nonattainment new source review permitting for new or modified major sources of pollution, and pollution controls for large existing plants. The few areas currently in nonattainment under the prior $PM_{2.5}$ standard will also benefit from designation, as they will have to adopt new, stronger plans to come into attainment with the lower standard. And people living in downwind attainment areas will also benefit from the reduction of $PM_{2.5}$ emissions in upwind nonattainment areas, as any level of fine particulate matter can cause health harms.

Delays in promulgating designations will severely harm Health, Environmental, and Community Groups' members by prolonging their exposure to particulate matter levels that EPA has found cause higher mortality and cardiovascular-related hospital admissions. Limaye Decl. ¶¶ 9, 21; 88 FR 5581/1-83/2, 5604/1, 5607/1-2, 5608/2. EPA also found that implementation of the new standard would reduce mortality rates, emergency room visits, lung cancer occurrence, asthma occurrence, and asthma symptoms, among other health benefits. RIA 17 tbl.ES-6. The attached Declarations, Exs.15-65, demonstrate the human impacts of these harms. For example, American Thoracic Society member Dr. Susanna McColley lives in Chicago, which has annual $PM_{2.5}$ levels that violate the 2024 standard. McColley Decl. ¶¶ 1-2, Ex.47; Graham Decl. ¶ 13. She usually enjoys running and biking several times a week, but checks the Air Quality Index and does not engage in these activities when there are high levels of $PM_{2.5}$ to avoid triggering her asthma and to reduce her risk of health harms from $PM_{2.5}$. McColley Decl. ¶¶ 10-12. As a pediatric pulmonologist, Dr. McColley receives more emergency room visits and gets more calls about her patients experiencing respiratory symptoms on days with high $PM_{2.5}$, and counsels her patients with chronic conditions to avoid outdoor activities on poor air quality days. *Id.* ¶¶ 3, 8. Other members of Plaintiffs and their families who live in areas with $PM_{2.5}$ levels that exceed the 2024 standard routinely find their ability to breathe impaired by air pollution. *See, e.g.*, Lawson Decl. ¶ 7, Ex.43; Smith Decl. ¶¶ 8, 12, 13, Ex.61; Ressler Decl. ¶ 4, Ex.56. Many are at greater risk of experiencing health impacts from $PM_{2.5}$ pollution due to chronic lung and heart conditions, or due to their age. *See, e.g.*, Miske Decl. ¶ 6, Ex.49; Scribner Decl. ¶ 8, Ex.58;

Sinclair Decl. ¶ 6, Ex.60; Garrett Decl. ¶ 7, Ex.34; Beshur Decl. ¶¶ 5-6, Ex.20. Members refrain from outdoor activities they would otherwise enjoy because of elevated PM$_{2.5}$ pollution levels, or engage in these activities but enjoy them less, due to acute symptoms from PM$_{2.5}$ exposure or health concerns from PM$_{2.5}$ pollution. *See, e.g.*, Garrett Decl. ¶ 10; Lawson Decl. ¶ 7; Smith Decl. ¶¶ 13-14; Hall Decl. ¶ 6, Ex.31; Ali Decl. ¶ 9, Ex.17; Bonitatibus Decl. ¶¶ 15-16, Ex.21; Hooks Decl. ¶ 8, Ex.33.

Because the attainment deadlines run from the effective date of designation, *see* 40 C.F.R. § 51.1004(a)(1), the fine particulate matter pollution levels in these areas will be allowed to remain at dangerously elevated levels for longer unless and until EPA takes its legally required action. *See* Limaye Decl. ¶¶ 21, 24. Health, Environmental, and Community Groups' members living in such areas experience severe harms to their health and wellbeing because of particulate matter pollution. They thus are and will be harmed by the delay in mandatory pollution reductions and the additional time that they will have to endure dangerous particulate matter levels.

In short, EPA has delayed initial area designations beyond what the statute allows, extending the time that hundreds of thousands of Health, Environmental, and Community Groups' members will be exposed to excessive amounts of air pollution that causes serious harms to them, their families, and their patients. *See* Olinger Decl. ¶ 5; Stith Decl. ¶ 6; Trujillo Decl. ¶¶ 7-8, Ex.63. These harms are extremely serious—irreparable even (though the Court need not reach that question), *see Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) (irreparable harms include "pain, infection, amputation, medical complications, and death")—and without a court order compelling EPA to act, they will be allowed to persist longer still.

### B. A 150-day timeframe is appropriate, pragmatic, and reasonable.

When Congress "categorically mandate[s]" that EPA meet explicit deadlines, EPA is "deprive[d] of all discretion over the timing of its work." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987). Violations of such statutory deadlines should be corrected "as soon as possible," using all available means. *Delaney v. EPA*, 898 F.2d 687, 691 (9th Cir. 1990).

Urgency is particularly heightened in this case because Congress intended EPA to move "as expeditiously as practicable" to promulgate designations and then for nonattainment areas to come into attainment "as expeditiously as practicable," but no later than fixed deadlines calculated off the date of designation, and develop specific pollution control plans by deadlines similarly determined by the date of designation. 42 U.S.C. §§ 7407(d)(1)(B)(i), 7513(c)(1), 7513a(a)(2)(B); *see Alaska Ctr.*, 20 F.3d at 986 (district court should tailor the remedy to further "the congressional objectives" of the statute).

In fashioning an appropriate deadline, courts generally consider the original statutory time period for compliance, the public interest, and the time needed by the agency to properly do the job. *See Sierra Club*, 658 F. Supp. at 171-72. Where Congress directed an agency to perform a regulatory duty within a given time, the "agency carries a heavy burden to show" that its proposed remedy is as expeditious as possible, and that faster compliance is "impossible." *American Lung Ass'n v. Browner*, 884 F. Supp. 345, 347 (D. Ariz. 1994); *see also, e.g.*, *Train*, 510 F.2d at 712-13 ("injunction should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources," and agency has burden to demonstrate it is impossible to comply by deadline); *Cmtys. for a Better Env't*, 2008 WL 1994898, at \*2 (rejecting EPA's argument that "it is only obligated to demonstrate a reasonable schedule" and finding that "EPA bears the heavy burden of proving impossibility" (internal quotations and citations omitted)).

Here, Health, Environmental, and Community Groups respectfully request that the Court direct EPA to issue any 120-day letters within 30 days of the Court's order, take final action to promulgate all designations through publication in the Federal Register within 150 days of the Court's order, and make these designations immediately effective. This timeframe is expeditious and practicable, for it is consistent with available indications of progress EPA has already made toward making designations, fits with EPA's past practices, and still allows EPA to provide the legally required notice to states if it intends to depart from their recommendations. *See* 42 U.S.C. § 7407(d)(1)(B)(ii).[9]

---

[9] The Act expressly exempts designations from the notice and comment process, though it encourages notice and comment. 42 U.S.C. § 7407(d)(2)(B); *see also* Memorandum 3 (EPA

**1.  The statutory period for compliance supports the requested order.**

A 150-day deadline to publish effective designations is fully consistent with the Clean Air Act. "Congress enacted the Clean Air Act Amendments of 1970, mandating a 'massive attack on air pollution.'" *American Lung Ass'n v. EPA*, 134 F.3d 388, 388 (1998) (citations omitted); *see Train v. NRDC*, 421 U.S. 60, 64 (1975) (through the 1970 Amendments, "Congress…t[ook] a stick to the States"). The subsequent 1977 Amendments "reaffirmed" Congress's 1970 goal, including reinforcing the NAAQS framework's "precautionary and preventative orientation." *Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1152-55 & n.51 (D.C. Cir. 1980).

To bring about speedy implementation and protect public health, the Act requires the EPA to issue designations "as expeditiously as practicable, but in no case later than two years from the date of promulgation" of the standard. 42 U.S.C. § 7407(d)(1)(B)(i). Because the Act prescribes that EPA must "publish a notice in the Federal Register" to promulgate designations, *id.* § 7407(d)(2)(A), that two-year deadline is a deadline for publication in the Federal Register. As of the date of this filing, EPA has had over two years and two months to develop and promulgate designations. By the deadline of the requested 150-day order, EPA will have had over two years and 7 months, in addition to the time between this filing and any such order, to develop and publish designations in the Federal Register.[10] Accordingly, a 150-day deadline is well aligned with the designations framework as well as the broader purpose of the Act.

Critically, Congress's precise system for implementing standards has deadlines that are keyed to the date an area is designated as nonattainment, *see supra* p.5, making a 150-day order

---

typically provides public comments after issuing 120-day letters and "does intend to consider public input in the [PM$_{2.5}$] designations process" again). Plaintiffs' requested timeframe also allows for such notice and comment when EPA sends 120-day letters. For example, when issuing designations under the 2012 primary annual standard, EPA sent 120-day letters on August 19, 2014, announced a 30 day public comment period on August 29, 2014, and signed the final designations on December 18, 2014—121 days after sending the letter. 80 FR 2206, 2209, 2211 (Jan. 15, 2025).

[10] Nothing prevents EPA from continuing its work on designations even before this Court issues any ruling.

---

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-cv-03118-TSH                                                                    20

appropriate to prevent further implementation delay. And since EPA has taken the position that it is the effective date of the designations—not the promulgation date—that triggers subsequent statutory deadlines, *see, e.g.*, 40 C.F.R. §§ 51.1003(a)(2), 51.1004(a)(1), a remedy mandating an effective date is essential for remediating unlawful delays and ensuring that the statute's subsequent implementation deadlines are not further postponed. *See NRDC v. Sw. Marine, Inc.*, 236 F.3d 985, 1000 (9th Cir. 2000) (district courts have discretion to implement "equitable measures [] reasonably calculated to remedy [the] established wrong") (citations omitted).

While some implementation deadlines are dependent on the exact date of designations, *see, e.g.*, 42 U.S.C. § 7513a(a)(2)(B), others are based on the calendar year that designations occur, adding further statutory justification for a 150-day order here. The most important deadline for public health—the outermost date nonattainment areas must come into compliance with the new standard—depends on the calendar year a designation is made. *Id.* § 7513(c) (mandatory attainment deadlines are "no later than the end of the sixth calendar year after the area's designation as nonattainment" for moderate areas and "no later than the end of the tenth calendar year beginning after the area's designation as nonattainment" for serious areas); 40 C.F.R. § 51.1004(a)(1) (attainment deadlines are keyed to the calendar year of the effective date of designations). Thus, were the designations promulgated in the Federal Register and effective on or after January 1, 2027, the attainment deadline would be pushed back an entire year. To prevent this dramatic delay of critical statutory deadlines and effectuate Congress's framework to protect public health, a 150-day order for promulgation via publication in the Federal Register and immediate effective date is necessary.

Other statutory timeframes for designations also support a 150-day order. EPA has discretion in the designations process to modify a state's recommendations about designations as necessary to ensure the designations meet the requirements of the Act. 42 U.S.C. § 7407(d)(1)(B)(ii); *Alaska Ctr.*, 20 F.3d at 986-87 (approving of injunction that required agency to act, but left intact agency discretion over how exactly to act). To do so, EPA must notify the state "no later than 120 days" before it promulgates final designations that it intends to modify the state's recommendation and give the state "an opportunity to demonstrate why any proposed

modification is inappropriate." 42 U.S.C. § 7407(d)(1)(B)(ii). EPA will have adequate time to go through this process under Health, Environmental, and Community Groups' request.

### 2. A 150-day deadline gives EPA adequate time to finalize designations.

A 150-day overall deadline provides EPA with adequate time to finalize the designations, as EPA has the data it needs to promulgate designations and the broader designations process is already well underway.

Importantly, EPA already has all the information it has historically used to make designations.[11] The vast majority of states gave their recommended designations to EPA long ago. Winz Decl. ¶ 13. Per the records EPA released under the Freedom of Information Act, many have submitted exceptional events demonstrations, and EPA has processed many. Winz Decl. ¶¶ 19-20. EPA has the most recent design values based on quality-assured, certified monitoring data. *See supra* p.8. It has provided significant guidance, based on its prior practice (which survived judicial review), about how to make designations and determine nonattainment area boundaries. *See* Memorandum 3-8, Att.3 at 1-14, Att.4 at 1; *Miss. Comm'n*, 790 F.3d at 147, 149, 158-59 (upholding EPA's use of five-factor approach in ozone designations). EPA also has datasets with copious information relevant to making designations and determining nonattainment area boundaries: amounts of $PM_{2.5}$ emitted in every county; vehicle miles traveled in every county; the population of every county; and a variety of wind data. EPA, *Particle Pollution Designations Memorandum and Data for the 2024 Revised Annual $PM_{2.5}$ NAAQS* (last updated Feb. 4, 2026), https://www.epa.gov/particle-pollution-designations/particle-pollution-designations-memorandum-and-data-2024-revised (table titled "Datasets Provided by EPA to Support the Five-factor Analysis"), Ex.8. EPA even created a public tool to help in crafting designations and nonattainment area boundaries by making maps that rely on analyses of these datasets and the most recent official design values. *Id.* (section titled "C. $PM_{2.5}$ Designations

---

[11] Tellingly, EPA has never claimed it lacks sufficient information to promulgate 2024 $PM_{2.5}$ designations at any location, let alone nationwide.

Mapping Tool"); Memorandum 7. Thus, EPA has all the information it needs to make legally adequate designations within 150 days of this Court's order.

EPA has also addressed concerns about the calibration of certain $PM_{2.5}$ monitors that are used for calculating some design values. Specific models of Teledyne brand monitors, which have been approved for use by EPA since 2016, were discovered to have positive biases with $PM_{2.5}$ readings about 20% higher than other approved monitors. Supplemental Information on the EPA's Update of $PM_{2.5}$ Data from T640/T640X PM Mass Monitors, EPA-HQ-OAR-2023-0642-0033, at 1-2 (May 13, 2024) ("Teledyne Memo"), Ex.9; Graham Decl. ¶ 16. EPA addressed this issue in early 2024, undergoing public notice and comment and finalizing a methodology in May 2024 to retroactively update all $PM_{2.5}$ monitoring data in EPA's Air Quality System from these monitors to remove this bias. *See* Teledyne Memo 3-5; 89 FR 42874 (May 16, 2024). EPA's published 2023 and 2024 design values incorporated the updated Teledyne monitor data. Graham Decl. ¶ 16. EPA accordingly addressed this issue early enough to leave ample time for the designations process to proceed on schedule. Indeed, 45 states, D.C., Puerto Rico, the U.S. Virgin Islands, and 3 Tribes developed and submitted designations recommendations. Accordingly, this data calibration issue has been addressed and poses no barrier to EPA's issuance of final designations.

EPA has thus had ample time and information to work on and issue designations. Though EPA has made clear that it does not want to issue designations, *see supra* pp.7-8 (EPA moved D.C. Circuit to vacate 2024 standard by designations deadline, but 2024 standard remains in effect), its bare desire cannot justify its failure to carry out its statutory duty. *See Thomas*, 828 F.2d at 791 (EPA is "deprive[d] of all discretion over the timing of its work" when Congress mandates deadlines). EPA's inaction coupled with its explicit reluctance to act tacitly confirms it has failed to act with the "utmost diligence" to meet its statutory deadline. *In re Ozone Designation Lit.*, 286 F. Supp. 3d at 1090 (citing *Train*, 510 F.2d at 713). Because there is nothing that would have made it "infeasible or impossible for the EPA, acting in good faith, to meet the Congressional deadline," *Sierra Club v. Gorsuch*, 551 F. Supp. 785, 787 (N.D. Cal. 1982), the agency should not be rewarded with further time to complete its work beyond 150

days. Notably, though EPA's efforts have lagged, documents released through the Freedom of Information Act indicate that EPA has completed some work on designations already that would allow EPA to issue designations post-haste. *See supra* pp.8-9. EPA's publicly released records show it has received exceptional event submissions from 25 states and 2 Tribes, and throughout 2025 has issued responses on over half of these. Winz Decl. ¶¶ 19-20. Given the work already completed and the urgency of the task, EPA should be held to a strict—and achievable—timeline.

### 3. A 150-day timeframe is necessary to protect public health.

Swift action is necessary here to protect public health and the public interest. Further delaying the designations will cause serious harm to the breathing public and to the environment. *See supra* pp.16-18; Limaye Decl. ¶ 21 (delaying designations "will lead to a longer period of inaction before measures to abate health-harming $PM_{2.5}$ are undertaken in…important, heavily-impacted areas," resulting in "more asthma attacks, hospitalizations, lost workdays, emergency room visits, and premature deaths in those areas").

While every additional day of delay postpones important statutory implementation deadlines, the mandatory attainment dates are keyed to the calendar year when designations occur. 42 U.S.C. § 7513(c). Were EPA to have more than 150 days to promulgate effective designations, such designations may not occur until 2027 and the attainment deadline would be pushed back by an entire year.

A single year delay has devastating consequences. EPA estimated that in 2032—the year it assumed that Moderate nonattainment areas would have to attain the 2024 standard—the new standard would lead to 4,500 fewer premature deaths, 800,000 fewer cases of asthma symptoms, 1,990 fewer emergency department visits, 5,700 fewer people developing asthma, 160 fewer cases of lung cancer, and 290,000 fewer lost workdays. RIA 3, 17 tbl.ES-6. Pushing back the attainment deadline by a year would mean that many of these health benefits are not realized for another year. Instead, more people will be hospitalized, have asthma attacks, develop cancer, and die.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-cv-03118-TSH                                                              24

Accordingly, it is in the public interest for EPA to issue designations through publication in the Federal Register as expeditiously as possible to ensure that subsequent attainment deadlines are not pushed back a full calendar year, and for those designations to be made effective immediately upon publication. The requested deadline is expeditious, realistic, and urgently needed. *See Union Elec. v. EPA*, 427 U.S. 246, 256 (1976) (Clean Air Act is "a drastic remedy to what was perceived as a serious and otherwise uncheckable problem of air pollution").

## CONCLUSION

For the foregoing reasons, Health, Environmental, and Community Groups respectfully request that this Court enter summary judgment in their favor on the question of liability, declare EPA to be in violation of its mandatory Clean Air Act duty to promulgate initial area air quality designations under the 2024 $PM_{2.5}$ standard for all areas of the country by February 7, 2026, through publication in the Federal Register, and order EPA to complete its overdue duty by, (1) no later than 30 days from the date of this Court's order, sending 120-day notice letters to states and Tribes for any areas for which EPA proposes to modify a recommended designation and, (2) no later than 150 days from the date of this Court's order, promulgating immediately effective final designations of all areas of the country through publication in the Federal Register.

Dated: April 13, 2026

Respectfully submitted,

*/s/ Colin C. O'Brien*[12]
Sage Lincoln, PA Bar No. 333682
*Admitted pro hac vice*
Seth L. Johnson, DC Bar No. 1001654
*Admitted pro hac vice*
Earthjustice
1250 I (Eye) Street NW, 4th Floor
Washington, DC 20005
(202) 830-3311
(202) 797-5245
slincoln@earthjustice.org
sjohnson@earthjustice.org

Colin C. O'Brien, CA Bar No. 309413
Earthjustice
1 Sansome Street, Suite 1700
San Francisco, CA 94104
Tel: 415-217-2000/Fax: 415-217-2040
cobrien@earthjustice.org

*Counsel for Alliance of Nurses for Healthy Environments, American Lung Association, American Public Health Association, American Thoracic Society, Center for Biological Diversity, Northeast Ohio Community Resilience Centre, Rio Grande International Study Center, and Sierra Club*

*/s/ John Walke*
John Walke, DC Bar No. 450508
*Pro hac vice pending*
Emily Davis, CA Bar No. 314152
Sheena Patel, DC Bar No. 90029725
*Admitted pro hac vice*
Natural Resources Defense Council
1152 15th St NW, #300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org
spatel@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Hayden W. Hashimoto*
Hayden W. Hashimoto, CA Bar No. 325150
Shaun A. Goho, MA Bar No. 652287
*Pro hac vice pending*
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 624-0234
hhashimoto@catf.us
sgoho@catf.us

*Counsel for Citizens for Pennsylvania's Future, Clean Air Council, Conservation Law Foundation, and Michigan Environmental Council*

*/s/ Caroline Cress*
Caroline Cress, NC Bar No. 63104
*Admitted pro hac vice*
Southern Environmental Law Center
136 E. Rosemary Street, Suite 500
Chapel Hill, NC 27514
(919) 967-1450
ccress@selc.org

*Counsel for CleanAIRE NC, Georgia Interfaith Power & Light, and Savannah Riverkeeper*

---

[12] Pursuant to Civil Local Rule 5-1(i)(3), I attest that all other signatories have concurred in the filing of this document.

*/s/ Richard Yates*
Richard Yates, CA Bar No. 348185
Environmental Defense Fund
2060 Broadway
Suite 300
Boulder, CO 80302
(415) 293-6083
ryates@edf.org

*Counsel for Environmental Defense Fund*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:26-cv-03118-TSH                                                    27