United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLIANCE OF NURSES FOR HEALTHY ENVIRONMENTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LEE MICHAEL ZELDIN,<br><br>Defendant. | Case No. 26-cv-03118-HSG<br><br>**ORDER DENYING MOTION FOR ABEYANCE AND GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 31 |
| STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LEE MICHAEL ZELDIN,<br><br>Defendant. | Case No. 26-cv-03500-HSG<br><br>Re: Dkt. No. 40 |

On April 13, 2026, a coalition of environmental, community, and health organizations ("NGO Plaintiffs") filed suit against Defendant Lee Zeldin in his official capacity as the Administrator of the United States Environmental Protection Agency ("EPA"). *See* Dkt. No. 1 ("NGO Compl.").[1] That same day, NGO Plaintiffs filed a motion for summary judgment. *See* Dkt. No. 16 ("NGO Mot.").

On April 24, 2026, ten states, the District of Columbia, the County of Harris, Texas, and the City of New York, New York ("State and Local Plaintiffs") asserted virtually identical claims against Defendant. *See State of California et al v. Zeldin*, Case No. 4:26-cv-03500-HSG, Dkt. No.

---

[1] Unless otherwise specified, all docket numbers refer to *Alliance of Nurses for Healthy Environments et al, v. Zeldin*, Case No. 4:26-cv-03118-HSG.

1 (original complaint), Dkt. No. 56 ("State and Local Compl.").[2]  State and Local Plaintiffs moved for summary judgment on May 6, 2026.  Case No. 4:26-cv-03500-HSG, Dkt. No. 40 ("State and Local Mot.").

The Court related these actions on May 4, 2026.  *See* Dkt. No. 36; *see also* Dkt. No. 49 (granting coordination for summary judgment and abeyance proceedings).  Both motions are now pending before the Court and fully briefed, as is Defendant's motion for abeyance.  Dkt. No. 31 (motion for abeyance); Dkt. No. 50 ("Opp."); Dkt. No. 52 ("NGO Reply"); Case No. 4:26-cv-03600-HSG, Dkt. No. 54 ("State and Local Reply").  The Court held a hearing on the motions on June 25, 2026.  Dkt. No. 57 (minute entry); Dkt. No. 64 ("Tr.").  Having carefully considered the parties' arguments, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motions for summary judgment and **DENIES** Defendant's motion for abeyance.

## I.    BACKGROUND

### a.  The Clean Air Act

The Clean Air Act ("CAA") "protect[s] and enhance[s] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  One "primary goal" of the CAA is "pollution prevention."  *Id.* § 7401(c).  To that end, the Act directs the EPA Administrator to "publish . . . a list [of] air pollutant[s]" that "in [the Administrator's] judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare."  *Id.* § 7408(a)(1)(A).  After the Administrator lists an air pollutant, the Administrator must also issue corresponding air quality criteria and national ambient air quality standards ("NAAQS").  *Id.* §§ 7408(a)(2), 7409(a).  Relevant here, national primary ambient air quality standards are "ambient air quality standards the attainment and maintenance of which in the judgement of the Administrator, based on such criteria and allowing an adequate margin of safety, are requisite to protect the public health."  *Id.* § 7409(b)(1).  The Administrator must periodically review and revise the criteria and standards promulgated under these subsections.  *Id.* § 7409(d)(1).

---

[2] State and Local Plaintiffs filed an amended complaint on June 23, 2026, joining Rhode Island as a Plaintiff.  *See* State and Local Compl. ¶ 16.

Once EPA revises or promulgates these standards, several consequences follow. "Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) . . . as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard." *Id.* § 7407(d)(1)(B)(i).[3] The possible designations are "nonattainment," "attainment," and "unclassifiable." A nonattainment area is an area that "does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant." *Id.* § 7407(d)(1)(A)(i). An attainment area is an area "that meets the national primary or secondary ambient air quality standard for the pollutant." *Id.* § 7407(d)(1)(A)(ii). An unclassified area "cannot be classified on the basis of available information." *Id.* § 7407(d)(1)(A)(iii).

Designations are initially recommended to the Administrator by the states: "By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall . . . submit to the Administrator a list of all areas (or portions thereof) in the State, designating as" nonattainment, attainment, or unclassifiable. *Id.* § 7407(d)(1)(A).[4] But "the Administrator may make such modifications as the Administrator deems necessary," provided the Administrator "shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate" no later than "120 days before the date the Administrator promulgates the designation." *Id.* § 7407(d)(1)(B)(ii). "If the Governor fails to submit the list in whole or in part . . . the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State." *Id.*

Attainment designations also lead to a variety of consequences. For instance, "[a]t the time

---

[3] The Administrator must "publish a notice in the Federal Register promulgating" the required designations. 42 U.S.C. § 7407(d)(2)(A).

[4] Tribes, the District of Columbia, and several U.S. territories are treated as states. 42 U.S.C. §§ 7601(d)(1), 7602(d).

3

the Administrator promulgates the designation of an area as nonattainment," the Administrator "shall establish a schedule according to which the State containing such area shall submit a plan or plan revision," which "shall provide for the implementation of all reasonably available control measures as expeditiously as practicable . . . and shall provide for attainment of the national primary ambient air quality standards." *Id.* § 7502(b), (c)(1); *see also id.* § 7502(c) (describing other requirements for plan provisions, such as permitting for construction and operation of new or modified major stationary sources).

### b. PM$_{2.5}$ Standards

This case concerns the national air ambient quality standards for "PM$_{2.5}$," a fine particulate matter that "can cause cardiovascular disease, respiratory disease, cancer, and premature death" at certain levels of exposure. NGO Compl. ¶ 3; State and Local Compl. ¶ 1; Dkt. No. 53 ("Answer") ¶ 3; *see also* Dkt. No. 16-3 at 41–46.[5] EPA promulgated revised PM$_{2.5}$ standards on February 7, 2024, strengthening the nonattainment threshold from 12.0 μg/m$^3$ to 9.0 μg/m$^3$. Dkt. No 16-14 ("Graham Decl.") ¶ 6; Dkt. No. 16-15 ("Limaye Decl.") ¶ 8; Case No. 4:26-cv-03500-HSG, Dkt. No. 40-1 ("Fideldy Decl.") ¶ 23; *Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, 89 Fed. Reg. 16202 (March 6, 2024), codified at 40 C.F.R. § 50.20.

It is undisputed that EPA has not yet promulgated designations for any state. *See, e.g.*, Answer ¶ 48; Case No. 4:26-cv-03500-HSG, Dkt. No. 40-3 ("Keith Decl.") ¶ 10. Plaintiffs argue that the CAA required EPA to promulgate those designations by February 7, 2026, and they now seek declaratory relief and an injunction ordering EPA to promulgate the designations. NGO Compl. ¶¶ 5–6; State and Local Compl. ¶ 2. Plaintiffs bring their claims for violation of the CAA under 42 U.S.C. § 7604(a)(2), which authorizes suit "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty . . . which is not discretionary."

## II. LEGAL STANDARD

### a. Abeyance

A district court's "power to stay proceedings is incidental to the power inherent in every

---

[5] Pincites refer to PDF pagination unless otherwise specified.

United States District Court
Northern District of California

court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  To determine whether a *Landis* stay is warranted, courts consider: (1) "the possible damage which may result from the granting of a stay"; (2) "the hardship or inequity which a party may suffer in being required to go forward"; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).  "[I]f there is even a fair possibility that the stay for which [the requesting party] prays will work damage to [someone] else," then the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255.  The decision whether to grant a *Landis* stay is ultimately within the Court's discretion.  *See Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007).

### b.  Summary Judgment

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.*  The Court views the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).

The moving party bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103

(9th Cir. 2000). In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotation omitted). If a nonmoving party fails to produce evidence that supports its claim or defense, courts enter summary judgment in favor of the movant. *See Celotex*, 477 U.S. at 323.

## III.    MOTION FOR ABEYANCE

EPA moved for abeyance pending the D.C. Circuit's decision on the legality of the 2024 $PM_{2.5}$ national air ambient quality standards that are the subject of this litigation. Dkt. No. 31 at 2. The 2024 rule was challenged by several petitioners in early 2024, and EPA confessed error and filed a motion to vacate the rule in November 2025. *Id.* at 2–3. EPA argues that "[i]f the D.C. Circuit determines that the 2024 PM2.5 NAAQS were unlawful for the reasons proffered by EPA or any other reason, then the 2024 PM2.5 NAAQS will be vacated and EPA will no longer have any duty or authority to issue the area designations Plaintiffs seek to compel." *Id.* at 4. "Accordingly, this case would be moot," and "[a]n abeyance . . . would preserve resources of both the Court and the parties." *Id.* EPA "requests that the Court hold this matter (and any related matters) in abeyance until the D.C. Circuit issues a final decision on the lawfulness of the 2024 PM2.5 NAAQS" or "at least until the D.C. Circuit resolves EPA's motion for vacatur of the 2024 PM2.5 NAAQS." *Id.* at 5.

As it turns out, the D.C. Circuit denied EPA's motion for vacatur and the petition to review the 2024 $PM_{2.5}$ NAAQS on June 26, 2026, a day after the motions hearing for this case. *See Kentucky v. EPA*, No. 24-1050, 2026 WL 1839715 (D.C. Cir. June 26, 2026). Though the mandate has not yet issued, at present there is no longer any pending case that may moot the issues raised by Plaintiffs. EPA briefly suggests that it is "deciding whether EPA will take additional steps either in the form of a petition for rehearing en banc or petition for certiorari." Dkt. No. 62 at 2. But the vague suggestion that EPA *might* seek *permission* to appeal, which *might* result in a decision that moots this case months or years from now does not establish that holding this case in abeyance would promote the orderly course of justice. Plaintiffs have demonstrated a fair

United States District Court
Northern District of California

possibility of real health harms from delaying these proceedings, *see* Dkt. No. 35 at 3, and EPA has not made out a clear case for hardship or inequity in being forced to move forward now that the D.C. Circuit has issued its opinion. The Court declines to exercise its discretion to hold this matter in abeyance and **DENIES** the motion.

## IV. MOTIONS FOR SUMMARY JUDGMENT

EPA does not seriously dispute that it failed to perform its non-discretionary duty to promulgate $PM_{2.5}$ designations. Instead, EPA argues that (1) Plaintiffs lack standing; (2) the Court should decline jurisdiction under the prudential ripeness doctrine; and (3) Plaintiffs' proposed remedies are infeasible and impossible. Opp. at 8.

### A. Standing

EPA contends that neither NGO Plaintiffs nor State and Local Plaintiffs have standing to sue. Opp. at 17–20. The Court disagrees, finding that both sets of Plaintiffs have shown standing.

#### i. Legal Standard

A plaintiff seeking relief in federal court bears the burden of establishing the "irreducible constitutional minimum" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). First, the plaintiff must have suffered an "injury in fact." *Spokeo*, 578 U.S. at 338. This requires an "invasion of a legally protected interest" that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Second, the plaintiff's injury must be "fairly traceable to the challenged conduct of the defendant." *Spokeo*, 578 U.S. at 338. In other words, "there must be 'a causal connection between the injury and the conduct complained of.'" *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 994 (9th Cir. 2000) (quoting *Lujan*, 504 U.S. at 560). Third, the injury must be "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.

#### ii. NGO Plaintiffs

When, as here, organizations bring suit on behalf of their members, "there is yet another layer of analysis." *Sierra Club v. Johnson*, No. C 08-01409 WHA, 2009 WL 482248, at *2 (N.D. Cal. Feb. 25, 2009). An organization "has standing to bring suit on behalf of its members when:

United States District Court
Northern District of California

United States District Court
Northern District of California

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

NGO Plaintiffs easily satisfy the second and third prongs of the *Hunt* test. NGO Plaintiffs advocate for cleaner air, exactly the subject of the present suit. *See, e.g.*, Dkt. No. 16-18 ¶ 16 (Plaintiff Clean Air Council is "dedicated to protecting and defending everyone's right to . . . breathe clean air"); Dkt. No. 16-21 ¶ 3 (Plaintiff American Public Health Association "has long advocated in support of the Clean Air Act and for strong public health protections from fine particulate matter ('PM$_{2.5}$') and other dangerous air pollutants"); Dkt. No. 16-23 ¶ 5 (Plaintiff Savannah Riverkeeper "work[s] to make the Augusta metropolitan area healthier and reduce the disproportionate industrial pollution burdens borne by Augusta residents"). And participation of individual members is not required, given that NGO Plaintiffs only seek declaratory and injunctive relief for individual members. NGO Compl. at 15; *see Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (finding that, because declaratory and injunctive relief "do not require individualized proof, the third prong of the *Hunt* test is satisfied").[6]

The Court also concludes that NGO Plaintiffs' members would have Article III standing to sue in their own right. NGO Plaintiffs submitted numerous declarations from individual members who "live, work, recreate, worship, and carry out other activities in areas where recent official EPA measurements report harmful levels of fine particulate matter pollution, but where EPA has not yet promulgated designations." NGO Mot. at 18 (citing Dkt. Nos. 16-14, 16-17–16-67). These declarations additionally demonstrate that "[s]uch particulate pollution endangers the health of their members and their members' families, and diminishes members' enjoyment of their outdoor activities by causing them to limit the time they spend outdoors." *Id.* Courts have found concrete and particularized injury to plaintiffs in similar circumstances involving exposure to environmental contaminants. *See, e.g.*, *Sierra Club v. U.S. EPA*, 762 F.3d 971, 977–78 (9th Cir.

---

[6] NGO Plaintiffs also seek litigation costs for themselves, NGO Compl. at 15, but this will not require the involvement of individual members.

2014) (concluding that increased exposure to nitrogen dioxide emissions, which "likely causes adverse effects on the respiratory system," constitutes a cognizable injury); *Clean Wis. v. EPA*, 964 F.3d 1145, 1157 (D.C. Cir. 2020) (finding injury where association member submitted declaration that EPA attainment designation exposed him to unhealthy ozone concentrations while working outdoors); *see also Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 832 (9th Cir. 2021) (finding injury in fact where "members' declarations averr[ed] to frequent use of the [polluted waterway] for recreational or academic purposes, a noticeable decrease in water quality conditions because of . . . discharges, and a resulting decline in their enjoyment of the waterway").

These injuries are fairly traceable to EPA's failure to promulgate designations, since "[CAA]-mandated attainment deadlines are keyed to the date of designation." NGO Mot. at 12. For example, due to EPA's failure to promulgate designations, "[n]ew or modified major sources of $PM_{2.5}$ pollution" have not yet been required to "offset their new $PM_{2.5}$ emissions and meet the 'lowest achievable emission rate'" to comply with the more stringent 2024 NAAQS, NGO Mot. at 12 (citing 42 U.S.C. § 7503(a)(1)(A), (a)(2)), "[a]nd existing sources in nonattainment areas" have not yet been required to adopt "reasonably available control technology" to meet the 2024 NAAQS, NGO Mot. at 12 (citing 42 U.S.C. § 7502(c)(1)). *See also* 42 U.S.C. § 7513 (discussing required attainment dates). And EPA does not dispute that higher levels of $PM_{2.5}$ pollution are causally linked to such catastrophic injuries as "death, serious cardiovascular harms[,] . . . respiratory harms[,] . . . neurological harms[,] . . . and lung cancer." NGO Mot. at 10; Dkt. No. 16-3 at 41–46; *see also WildEarth Guardians v. EPA*, 830 F.3d 529, 535 (D.C. Cir. 2016) (finding that "[t]he health and economic costs of increased $PM_{2.5}$ pollution for individuals in nonattainment areas constitute injuries in fact that are fairly traceable to" the EPA's failure to institute more stringent $PM_{2.5}$ rules under the CAA); *Clean Wis.*, 964 F.3d at 1157 ("By preserving the status quo rather than demanding stricter pollution controls, EPA's designations increase the likelihood that Environmental Petitioners' members will experience ozone-related injuries.").

Lastly, NGO Plaintiffs' injury is redressable by a favorable Court decision. As discussed above, NGO Plaintiffs have demonstrated that ordering EPA to promulgate designations will lead

United States District Court
Northern District of California

to faster implementation of $PM_{2.5}$ pollution mitigation mechanisms across the country. *Cf. Sierra Club v. U.S. EPA*, 762 F.3d at 978 (finding it "sufficiently clear that judicial review of EPA's refusal to enforce" more stringent standards for nitrogen and carbon dioxide under the CAA would "provide [plaintiffs'] members with redress").

EPA argues that NGO Plaintiffs do not have standing to seek the promulgation of all designations across the country, as NGO Plaintiffs' members "do not cover all areas of the country." *See* Opp. at 19–20. Even if this is true, pollution generated in one county does not only injure individuals in that county. Rather, "[p]articulate matter pollution . . . emitted in upwind states can also be transported downwind to other states." Graham Decl. ¶ 23; Limaye Decl. ¶ 23; *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014) ("Pollutants generated by upwind sources are often transported by air currents, sometimes over hundreds of miles, to downwind States."). The injuries that NGO Plaintiffs' members suffer due to EPA's failure to promulgate designations flow both from the members' own counties and from faraway counties; NGO Plaintiffs' members do not have to live in a given county to be injured by EPA's failure to promulgate a designation in that county.

Even if this were not the case, the CAA "imposes a single, date-certain duty" to promulgate designations for all areas. NGO Reply at 10. NGO Plaintiffs rely on *Alaska Center for the Environment v. Browner*, 20 F.3d 981 (9th Cir. 1994), arguing that they have submitted "member declarations from more than 30 states across all 10 EPA Regional offices," and that the CAA imposes no narrower obligation than the requirement to "promulgate the designations of all areas" across the country. *See* NGO Reply at 11–12 (quoting 42 U.S.C. § 7407(d)(1)(B)(i)). In *Alaska Center*, the Ninth Circuit determined that plaintiffs alleging that the EPA had failed to fulfill its duty under the Clean Water Act ("CWA") to maintain adequate water quality in Alaska need not show that they experienced injury from every waterway that they wanted to compel EPA to regulate. 20 F.3d at 985–86. The Ninth Circuit noted that the CWA required EPA to identify waters that were deficient in quality "in each state." *Id.* at 985 (quotation omitted). The Ninth Circuit explained that "[i]t would be contrary to congressional directive to permit individual plaintiffs or a federal court to deal with only a fraction of the waters and, in effect, impose their

own prioritization upon the EPA by limiting the scope of an ordered remedy to specific streams of paramount concern to the parties before the court." *Id.* Because the plaintiffs established injury related to a "representative number of waters throughout the state of Alaska," and the CWA's language required EPA to establish standards for the whole state and "impose[d] no narrower obligation," the Ninth Circuit held that the plaintiffs had standing to sue for statewide relief. *Id.*

The Court finds that the CAA imposes no narrower obligation on EPA than the requirement to promulgate designations for the whole nation, and *Alaska Center* controls here. NGO Plaintiffs have shown that they were harmed by EPA's failure to perform its single, non-discretionary duty, and they have standing to request performance of that single, indivisible duty. EPA has not identified any cases that require, or even allow, the Court to contravene the statutory scheme and mandate EPA to promulgate designations for only some regions but not others.[7] This conclusion is also consistent with several cases where the Ninth Circuit has affirmed standing for plaintiffs challenging agency actions that spanned multiple regions of the country, even where the plaintiffs failed to show concrete injury tied to every region affected. *See, e.g.*, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 35 (9th Cir. 2025) (discussing, in a case challenging the Bureau of Land Management's ("BLM") oil and gas lease policies on protected sage-grouse habitats, that "our caselaw does not require plaintiffs to show harm tied to each parcel of land on which a lease was granted"); *WildEarth Guardians v. USDA*, 795 F.3d 1148, 1155 (9th Cir. 2015) (holding that the fact that a policy "applie[d] to other geographic regions that [plaintiff's member did] not visit [was] irrelevant to the standing analysis").

---

[7] Admittedly, NGO Plaintiffs omit a portion of the statute: EPA must "promulgate the designations of all areas *(or portions thereof)*" submitted by states. 42 U.S.C. § 7407(d)(1)(B)(i) (emphasis added). But it is clear that "portions thereof" consistently modifies "area" or "areas" throughout this section, addressing the situation where EPA promulgates a designation for a sub-division of an air quality control region. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016) (explaining that "[t]he governor of each State is responsible for designating an area—an entire air quality control region or portion thereof"); 42 U.S.C. § 7407(d)(1)(B)(ii) (noting "the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State"); 42 U.S.C. § 7407(b)(2) (allowing for subdivision by the state into multiple air quality control regions); *Meza-Carmona v. Garland*, 113 F.4th 1163, 1167 (9th Cir. 2024) ("Under the presumption of consistent usage, a word or phrase is presumed to bear the same meaning throughout a text." (quotation omitted)). This does not give EPA discretion to decide whether it will promulgate designations for some or all regions of the country.

###### iii.    State and Local Plaintiffs

The Court also concludes that at least one State and Local Plaintiff has standing.  State Plaintiffs introduce evidence that EPA's failure to promulgate designations is causing them economic harm, as "[n]onattainment designations also unlock federal grants that Congress intended to support state efforts to reduce harmful air pollution in nonattainment areas."  State and Local Mot. at 19 (citing 23 U.S.C. § 149(b); 42 U.S.C. § 7505); *see also* Fideldy Decl. ¶ 33 ("The lack of designations is also delaying [the California Air Resources Board's ("CARB")] and local air districts' ability to apply for federal grant funding for certain high-need areas."); *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (finding that, where "at least some" state plaintiffs have demonstrated that "they will lose out on federal funds" due to defendant's decision, "[t]hat is a sufficiently concrete and imminent injury to satisfy Article III").  And the Court can likely redress this injury through a favorable decision for State Plaintiffs, as, once EPA promulgates designations under the 2024 NAAQS, EPA "shall make grants . . . for payment of the reasonable costs of developing a plan revision" for designated areas.  42 U.S.C. § 7505(a); *see also* 23 U.S.C. § 149(b) (empowering states to "obligate funds . . . if the project or program is for an area in the State that is or was designated as a nonattainment area for . . . particulate matter under . . . the Clean Air Act"); Fideldy Decl. ¶ 17 (noting the city of Portola was able to get a federal grant as a result of its prior designation as nonattainment).[8]

---

[8] State and Local Plaintiffs may have other bases for standing.  For example, State Plaintiffs argue that "$PM_{2.5}$ pollution causes significant public health harms within" their jurisdictions, which also "result in increased costs to public health care systems, lost days [at] work and school, and more." State and Local Mot. at 20 (citing Keith Decl. ¶¶ 12–13); *see also* Fideldy Decl. ¶ 21 (noting health burdens in California).  The Ninth Circuit has held that "a state may sue to assert its 'quasi-sovereign interests in the health and well-being—both physical and economic—of its residents in general.'" *California v. Trump*, 963 F.3d 926, 936 (9th Cir. 2020) (quotation omitted); *see also Washington v. U.S. FDA*, 108 F.4th 1163, 1178 (9th Cir. 2024) (noting that state plaintiffs must identify a "distinct interest of the state as a whole" to bring such claims against the federal government).  Additionally, State and Local Plaintiffs argue that they have a sovereign interest in "their ability to address $PM_{2.5}$ pollution using the regulatory tools that Congress provided to them," and they note that "the delay in the development and submission of state implementation plan control strategies . . . threatens to delay federal approval of those control strategies, meaning state and local regulators cannot rely on the tools the Clean Air Act provides to ensure compliance with those control strategies, including federal enforceability."  State and Local Mot. at 18–19. Because the Court has already identified at least one redressable and causally-related injury for at least one plaintiff, the Court need not reach these other arguments.

United States District Court
Northern District of California

EPA argues that states "do not need to wait for any of the areas in their borders to be designated nonattainment to take additional steps" to mitigate $PM_{2.5}$ pollution.  Opp. at 18.  To support this contention, EPA cites *Arizona v. EPA*, 77 F.4th 1126 (D.C. Cir. 2023).  There, the D.C. Circuit found a lack of standing because "[n]othing prevent[ed] . . . states from meeting their obligations ahead of the federal deadline." *Arizona*, 77 F.4th at 1129.  In contrast, State Plaintiffs have pointed the Court to statutes that tie federal funding to the EPA's not-yet-promulgated designations.  Additionally, *Arizona* dealt with state plaintiffs challenging a straightforward and fixed extension to a compliance deadline for lead contents in drinking water.  Here, "[t]he lack of final designations means . . . regulators do not know the attainment deadlines, the boundaries of any new nonattainment areas, or even whether U.S. EPA will agree with [states'] proposed designations." Fideldy Decl. ¶ 30.  Even if states could take some additional steps to mitigate pollution, it appears that they cannot take certain actions until EPA promulgates its designations.[9]

EPA additionally contends that State Plaintiffs' injuries should be disregarded because State Plaintiffs have not shown "that they cannot apply [for federal funding] due to the lack of designations, or that they have tried to apply but been refused." Opp. at 19.  But State Plaintiffs introduce undisputed evidence from California that CARB "anticipates applying for upcoming U.S. EPA targeted airshed grants for San Diego County," which "has some of the highest levels of annual $PM_{2.5}$ in the nation," but "because San Diego County is not currently designated nonattainment for the annual $PM_{2.5}$, it is not eligible for a targeted airshed grant." Fideldy Decl. ¶ 33; *see also* State and Local Reply at 11–12 (discussing evidence that targeted airshed grants are limited to nonattainment areas).  This is sufficient to show both "a sufficient likelihood of future injury" and an "actual or imminent, not speculative" injury for California.  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *cf. Kaahumanu v. Hawaii*, 682 F.3d 789, 796 (9th Cir. 2012) ("Plaintiffs who challenge a permitting system are not required to show that they have applied for, or have been denied, a permit. . . . Plaintiffs must only have declined to speak, or have

_____

[9] Additionally, even if State Plaintiffs could avoid the injury on their own, "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation." *California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018).

modified their speech, in response to the permitting system.").

Lastly, as it did for NGO Plaintiffs, EPA contends that State and Local Plaintiffs do not have standing to seek a nationwide promulgation of designations. Opp. at 20. As discussed above, *Alaska Center* controls: given that the CAA imposes "no narrower obligation" than the requirement to promulgate designations for the whole nation, State Plaintiffs have standing to compel EPA to perform this single, indivisible duty. *See* 20 F.3d at 985.[10] [11]

### B. Prudential Ripeness

EPA argues that the Court should decline jurisdiction under the prudential ripeness doctrine. Opp. at 15–17. "Prudential ripeness turns on two considerations: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Flaxman v. Ferguson*, 151 F.4th 1178, 1188 (9th Cir. 2025) (quotation omitted). The fitness prong is satisfied when "the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stockton v. Brown*, 152 F.4th 1124, 1149 (9th Cir. 2025) (quotation omitted). "Unlike Article III ripeness, [p]rudential considerations of ripeness are discretionary." *Flaxman*, 151 F.4th at 1188 (quotation omitted).

EPA argues that these claims are not fit for decision because "[f]urther factual

---

[10] EPA argues that State Plaintiffs have not provided evidence of harm in enough regions of the country, as "State Plaintiffs provided declarations from officials in only three of the States and one county in Texas." Opp. at 20. While *Alaska Center* did reference the fact that the plaintiffs had "demonstrated representation and injury throughout the entire area for which they seek relief," the court's analysis turned on the nature of the statutory scheme. 20 F.3d at 986. The Court continues to believe that the key fact here is that "the relief ordered in this case involves . . . the performance of a precise duty," and "[t]o limit relief in this case . . . would unduly interfere with the statutory scheme established by Congress." *Id.* Moreover, the Court is not persuaded that these four declarations are inherently insufficient to create a representative sample. *See Johnson*, 2009 WL 482248, at *3 (applying *Alaska Center* and finding that injuries "in varying parts of the country, including Texas, Colorado, New Mexico, Nevada, and Idaho" were sufficient to show standing for "nationwide relief" from EPA).

[11] State Plaintiffs are also likely entitled to "special solicitude" under *Massachusetts v. EPA*. The Supreme Court there held that Massachusetts had standing to contest EPA's decision not to regulate greenhouse-gas emissions that allegedly contributed to a rise in sea levels and a loss of coastal land. *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). It was "of considerable relevance" to the Court "that the party seeking review [was] a sovereign State and not . . . a private individual" because "States are not normal litigants for the purposes of invoking federal jurisdiction." *Id.* at 518; *California v. Trump*, 963 F.3d 926, 936 (9th Cir. 2020) (discussing *Massachusetts v. EPA*). Because the Court is able to independently conclude that at least one State Plaintiff has standing, the Court does not reach this issue.

14

development—in the form of a decision by the D.C. Circuit as to the validity of the 2024 Rule—is essential to advance this Court's decision as to whether Plaintiffs are entitled to any relief whatsoever." Opp. at 16. EPA also argues that withholding consideration would not impose immediate, direct, and significant hardship on Plaintiffs because their harms "are years in the future, take the form of potential foregone benefits in certain areas of the country, and turn on multiple contingent future actions by EPA, . . . as well as courts of competent jurisdiction authorized to review actions taken under the detailed statutory and regulatory process for implementation of the NAAQS." *Id.* at 16–17.

The Court is skeptical that a pending challenge in the D.C. Circuit could have constituted "further factual development" for purposes of prudential ripeness, and EPA could not identify a case embracing this view at the hearing. *See* Tr. 16:18–17:12. Regardless, the D.C. Circuit has subsequently provided the "factual" clarity that EPA was seeking and did not moot the basis for this case. The remaining issues—legal arguments about standing, questions of whether Plaintiffs have met their burden to show that EPA missed its non-discretionary deadline, and determinations of the appropriate equitable relief—are clearly ripe on this record. As a result, the Court concludes this issue is fit for judicial decision and there is no adequate basis for withholding court consideration.[12]

### C. Liability

For purposes of liability, the CAA's operative provision states:

> Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

42 U.S.C. § 7407(d)(1)(B)(i). There is no real dispute that EPA triggered the statutory compliance

---

[12] As mentioned, EPA suggests that it is "deciding whether EPA will take additional steps either in the form of a petition for rehearing en banc or petition for certiorari," and thus "this case continues to be prudentially unripe." Dkt. No. 62 at 2. But that vague possibility does not make this issue unfit for judicial decision.

United States District Court
Northern District of California

period when it last revised the PM$_{2.5}$ NAAQS on February 7, 2024. *See* NGO Mot. at 13; State and Local Mot. at 15; Dkt. No. 16-5 ("2024 EPA Memo") at 2 (EPA memorandum identifying February 7, 2024 promulgation date); Opp. at 14; Graham Decl ¶ 6; Limaye Decl. ¶ 8; Fideldy Decl. ¶ 23. No party has suggested that EPA was entitled to an extension because it had "insufficient information" to promulgate the designations. As a result, EPA was required to promulgate the designations by February 7, 2026. *See* Opp. at 14 (acknowledging February 7, 2026 "area designation deadline"). EPA does not dispute that it has not yet done so. *See* Answer ¶ 49; Case No. 4:26-cv-03500-HSG, Dkt. No. 73 ¶ 2.

Because there is no dispute that EPA failed to timely fulfill its non-discretionary duty, summary judgment in favor of Plaintiffs is appropriate. *See Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 52 (D.D.C. 2006) ("Because defendant does not contest the issue of liability, the entry of summary judgment is appropriate, and it remains only for the Court to fashion an appropriate equitable remedy."); *Am. Lung Ass'n v. Browner*, 884 F. Supp. 345, 346 (D. Ariz. 1994) ("Summary judgment is appropriate where, as here, it remains only for the Court, acting in its discretion, to fashion an equitable remedy.").

### D. Remedy

The remaining question is what timetable and equitable relief to impose on EPA for it to complete its long-overdue nondiscretionary duties.[13] NGO Plaintiffs request an injunction compelling EPA to "(1) within 30 days of the Court's order send 120-day notice letters to states and Tribes for any areas for which EPA proposes to modify a recommended designation; (2) within 150 days of the Court's order promulgate designations through publication in the Federal Register; and (3) make those designations effective immediately." NGO Mot. at 22. State and Local Plaintiffs request an injunction "requiring the Administrator to promulgate all designations via publication of a notice in the Federal Register within 150 days of this Court's order." State and Local Mot. at 8. Defendant argues that 150 days is "infeasible and impossible for EPA to

---

[13] Because there is no dispute that EPA failed to meet its non-discretionary obligations to promulgate the PM$_{2.5}$ designations by February 7, 2026, via publication in the Federal Register, the Court enters the declaratory judgment of liability requested by Plaintiffs. *See* NGO Compl. at 15; State and Local Compl. at 16.

achieve in light of the work the Agency must undertake to complete the designations and the timelines set by Congress," and that "proposed remedies relating to the immediate effectiveness of designations and deadlines for 120-day letters to states announcing intended designations are outside the scope of the Court's jurisdiction."  Opp. at 8.

i.    Legal Standard

There is no doubt that the Court has authority to "order the Administrator to perform [its non-discretionary] duty."  42 U.S.C. § 7604(a); *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought." (quotation omitted)).  The Court has "broad latitude" to fashion an equitable remedy other than injunctive relief.  *Alaska Ctr.*, 20 F.3d at 986; *see also In re Ozone Designation Litig.*, 286 F. Supp. 3d 1082, 1091 (N.D. Cal. 2018) (setting deadlines for EPA to comply with mandatory duties under the CAA at summary judgment).

When Congress "categorically mandate[s]" that EPA meet explicit deadlines, EPA is "deprive[d] of all discretion over the timing of its work."  *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) (quotation omitted); *see also Delaney v. EPA*, 898 F.2d 687, 691 (9th Cir. 1990) ("When Congress has explicitly set an absolute deadline, congressional intent is clear[,] . . . [and] [t]he EPA cannot extract leeway from a statute that Congress explicitly intended to be strict.").  A delinquent agency bears a "heavy" burden of showing infeasibility or impossibility of issuing regulations within the statutory time frame, *Sierra Club v. Thomas*, 658 F. Supp. 165, 171–72 (N.D. Cal. 1987), and courts have applied this burden to determine whether to grant an agency's request for an extended timeline for statutory compliance, *see Ctr. for Biological Diversity v. Wheeler*, No. 19-CV-02462-RS, 2019 WL 9464390, at *3 (N.D. Cal. Dec. 11, 2019); *Sierra Club v. Wheeler*, 330 F. Supp. 3d 407, 422 (D.D.C. 2018), *aff'd*, 956 F.3d 612 (D.C. Cir. 2020).  That burden is "especially heavy where . . . the agency has failed to demonstrate any diligence what[so]ever in discharging its statutory duty to promulgate regulations and has in fact ignored that duty for several years."  *Thomas*, 658 F. Supp. at 172.  It is the Court's role to "separate justifications grounded in the purposes of the [statute] from the footdragging efforts of a

17

delinquent agency." *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974).

Courts should not, however, demand a deadline for agency compliance that is impossible or infeasible. *Id.* ("The sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls for him to do an impossibility." (quotation omitted)).  To determine whether a deadline is infeasible, the Court should consider: (1) whether the "budgetary" and "manpower demands" required are "beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs"; and (2) "methodological" limitations that prevent an agency from giving "meaningful consideration to the technical intricacies" underlying the regulations to be issued. *Id.* at 712–13.  With respect to this second constraint, "[e]xcuses for delay must go beyond the general proposition that further study and analysis of materials will make final agency action better, because further study will always make everything better, and it is always easier to do something with more rather than less time." *Am. Lung Ass'n*, 884 F. Supp. at 347.  Additionally, if Congress found that a certain amount of time was appropriate for the agency to complete its statutory duty in the first instance, that timeframe generally still controls.  *Thomas*, 658 F. Supp. at 171.

### ii.    Designation Date

Both sets of Plaintiffs seek a 150-day deadline for EPA to promulgate designations via publication in the Federal Register.  This would give EPA at least 30 days to finish reviewing state submissions and make its initial designations, along with time to issue 120-day notice letters to states for any areas for which EPA proposes to modify a recommended designation. *See* 42 U.S.C. § 7407(d)(1)(B)(ii).  Plaintiffs argue that 150 days is "expeditious and practicable [and] consistent with available indications of progress EPA has already made toward making designations, fits with EPA's past practices, and still allows EPA to provide the legally required notice to states if it intends to depart from their recommendations."  NGO Mot. at 26.

Specifically, Plaintiffs argue that "EPA has long had a process in place for issuing, as well as the necessary information to issue," its $PM_{2.5}$ designations by the original February 2026 deadline.  NGO Mot. at 15; State and Local Mot. at 16.  Plaintiffs introduce evidence that designations for $PM_{2.5}$ are based off three-year averages of $PM_{2.5}$ levels, also known as "design

United States District Court
Northern District of California

values." *See* NGO Mot. at 15; State and Local Mot. at 15; 2024 EPA Memo at 4, Att. 3 (EPA memorandum on 2024 rule explaining that EPA intended to use air quality data from 2022 to 2024 to determine attainment designations); Graham Decl. ¶¶ 11–12.  Plaintiffs also introduce evidence that EPA then intended to use a five-factor approach "consistent with those used in [prior PM$_{2.5}$] designations processes" to determine "what nearby areas contribute to the violation(s)" to establish additional nonattainment areas.  *See* NGO Mot. at 15; State and Local Mot. at 27–28; 2024 EPA Memo at 5–6, Att.3.  The 2024 design values have been available to the EPA since early June 2025, *see* NGO Mot. at 15; State and Local Mot. at 15; Dkt. No. 16-7, and 45 states, Washington D.C., Puerto Rico, the U.S. Virgin Islands, and 3 Tribes have submitted designation recommendations to EPA, Dkt. No. 16-16 ("Winz Decl.") ¶ 13–14; State and Local Mot. at 27.  Plaintiffs also argue that EPA "has datasets with copious information relevant to making designations and determining nonattainment area boundaries: amounts of PM$_{2.5}$ emitted in every county; vehicle miles traveled in every county; the population of every county; and a variety of wind data."  NGO Mot. at 29 (citing Dkt. No. 16-10).

Plaintiffs acknowledge that EPA also needs time to process "exceptional events" submitted by states, which are "specific unpreventable emission events that cause air pollution exceedances" and allow for exclusion of air monitoring data.  NGO Mot. at 16; State and Local Mot. at 27–28 & n.6; 2024 EPA Memo at 5, Att. 2.  States and Tribes were required to submit exceptional event demonstrations by no later than September 30, 2025.  *See* 2024 EPA Memo, Att. 2; *see also* 40 C.F.R. § 50.14.  Plaintiffs submit evidence suggesting that 25 states and 2 Tribes submitted these demonstrations, and EPA has already responded to more than a dozen of these submissions.  Winz Decl. ¶¶ 19–20.

Critically, and consistent with the above, EPA estimated in February 2024 that it would send out its 120-day letters on October 9, 2025, roughly one week after the exceptional event deadline on September 30, 2025.  2024 EPA Memo, Att. 2.  EPA then estimated it would promulgate its final designations on February 6, 2026, exactly 120 days after sending out the letters.  *Id.*  In addition, Plaintiffs present examples where EPA has been able to promulgate designations within 120 days of sending the 120-day letters in the past.  *See* NGO Reply at 15 n.6;

19

*see also* State and Local Reply at 14–15.  NGO Plaintiffs observe that "in many of the past processes . . . EPA was not operating under a court order.  Here, it will be, so it must devote more resources to remedying its illegal delay."  NGO Reply at 15.

Plaintiffs also stress that there is considerable urgency here.  They note that "[f]urther delaying the designations will cause serious harm to the breathing public and to the environment."  NGO Mot. at 31; Limaye Decl. ¶¶ 10, 21 (explaining that delaying designations "will lead to a longer period of inaction before measures to abate health-harming PM2.5 are undertaken in . . . important, heavily impacted areas," resulting in "more asthma attacks, hospitalizations, lost workdays, emergency room visits, and premature deaths in those areas"); Dkt. No. 16-6 (estimating significant reductions in PM-related mortalities and illnesses from a revised $PM_{2.5}$ standard); State and Local Mot. at 24–27 (discussing similar evidence and declarations).  Congress required EPA to act "as expeditiously as practicable," 42 U.S.C. § 7407(d)(1)(B)(i), and "[a] federal equity court may exercise its discretion to give or withhold its mandate in furtherance of the public interest, including specifically the interest in effectuating the congressional objective incorporated in regulatory legislation," *Train*, 510 F.2d at 713.

EPA does not dispute any of the evidence discussed above.  And despite Plaintiffs' significant evidence about the feasibility of a 150-day timeline and the underlying urgency, EPA did not initially propose an alternative timeline.  Instead, EPA argued that "Plaintiffs' proposed schedule wholly disregards the substantive efforts involved in promulgating designations," and listed fifteen steps it needed to complete, as supported by a declaration from Assistant Administrator Aaron Szabo.  Opp. at 22; Dkt. No. 50-3 ("Szabo June Decl.") ¶¶ 1, 16–28.[14]  While EPA asserted that there is "substantial analytical effort involved" in several of these steps, it did not attempt to explain how long each of these steps would take, nor did it address Plaintiffs' arguments.  *See* Opp. at 23.  In fact, EPA refused to provide any estimate for these steps, noting that "[b]ecause there is uncertainty as to the validity of the [relevant $PM_{2.5}$ standards] and

---

[14] As NGO Plaintiffs correctly point out, NGO Reply at 16, the opposition lists 15 steps, but the declaration lists only 12.

Plaintiffs' standing, EPA cannot propose a timeline at this early point in this litigation." Opp. at 24; Tr. at 18:15–19:17, 21:7–22:17.[15]

These arguments plainly did not satisfy EPA's "especially heavy" burden of showing infeasibility in light of its failure to act with the utmost diligence. *Thomas*, 658 F. Supp. at 172; *see also* NGO Reply at 20–21 (addressing diligence over the last two and a half years). EPA did not explain how long these tasks would take or why many of the tasks could not be performed in parallel. *Cf. Wheeler*, 2019 WL 9464390, at *3 ("The declaration submitted by the EPA explains in excruciating detail the intra-agency process that is undertaken to finalize a determination, but it provides no estimate of the time that process would take either generally or in this case."). EPA did not meaningfully contend with Plaintiffs' arguments that it can, has, and expected to promulgate designations within 120 days of issuing the 120-day notices to states and Tribes, or that it has long had the data it needs before sending out those 120-day notices. EPA also "[did] not claim to lack either the 'budgetary' or 'manpower' resources required to meet a 150-day deadline." NGO Reply at 16.

Despite this, the Court gave EPA one final opportunity to provide an estimated timeline in supplemental briefing. Dkt. No. 56. In that supplemental briefing, EPA estimates that it will need 18 months to promulgate designations. Dkt. No. 62 at 2; Dkt. No. 62-1 ("Szabo July Decl.") ¶ 6. EPA describes seven phases:

- In phase one (four months), EPA will conduct (1) an initial review of states' and Tribes' initial designations and "subsequently submitted information," such as exceptional events submissions; and (2) an independent factual analysis for states that did not submit designations. Szabo July Decl. ¶¶ 7–8.

- In phase two (four months), EPA will prepare draft technical support documents and continue discussions of designation issues among regions and headquarters. *Id.* ¶¶ 9–

---

[15] The Court sees no legitimate reason why EPA "could not" provide an estimate with 22 unused pages of briefing just because such an estimate might be unnecessary or inapplicable if EPA prevailed on other arguments. EPA could have submitted an estimated timeline assuming the Court adopted its standing analysis, rejected its standing analysis, or both. It was EPA's burden to show infeasibility, and this information was essential to determine the feasibility of any requested schedule.

10.

- In phase three (two months), EPA will prepare and conduct an initial review of electronic documents related to the intended designations, including 120-day letters, a Federal Register notice announcing EPA's intended designations and inviting public comment, and final draft technical support documents. *Id.* ¶ 11.

- In phase four (two months), EPA will conduct an additional management review of these electronic documents, sign these documents, and transmit them to the Federal Register for publication. *Id.* ¶¶ 12–14.

- In phase five (two months), EPA will allocate 60 days for states and Tribes to respond to proposed modifications of EPA's initial designations and provide time for a public notice and comment period. *Id.* ¶ 15.

- In phase six (two months), EPA will review any additional information from states and Tribes and from the public comment period and draft the final designations and supporting documents. *Id.* ¶¶ 16–17.

- In phase seven (two months), EPA will review all documents and resolve "any remaining issues prior to final decision and signature of the final" Federal Register notice. *Id.* ¶ 18.

Although the Court takes EPA's representations about the phases required to promulgate designations at face value, it rejects EPA's overall timetable for promulgation. Due to EPA's delinquency, it bears an "especially heavy" burden to prove that a shorter timeline is infeasible. *See Thomas*, 658 F. Supp. at 172. Broadly describing what tasks must be performed in the various phases as EPA largely does is unhelpful, as is asserting prolonged timelines with minimal explanation. Those steps presumably have always been required, yet in 2024 EPA estimated the remaining steps following exceptional events submissions would only take roughly 120 days to complete. *See* Szabo June Decl. ¶¶ 32–38 (identifying generic challenges that appear to always apply for promulgating designations). It is EPA's burden to go beyond a description of the process and instead explain why it cannot complete the process within a shorter amount of time, particularly given Plaintiffs' largely undisputed characterizations of the specific work that

22

remains. That is especially so where the CAA clearly envisions at most one year between the deadline for state submission of initial designations and EPA's promulgation of the final designations. *See* 42 U.S.C. § 7407(d)(1)(A), (B)(i).

In this regard, EPA fails to meet its burden. First, EPA argues that it needs four months just to complete an initial review of states' and Tribes' designations despite already having "begun preliminary evaluations of the initial designation submissions" because "the Agency must reevaluate these initial designations in light of new information," including "monitoring data for the 2025 calendar year and the resulting updated 2025 design values." Dkt. No. 62 at 3. But, as NGO Plaintiffs point out, EPA *always* considers states' designations with an additional year of data in hand under the statutory scheme, so it's not apparent what makes this unusual. *See* Dkt. No. 65 at 3. It's true that EPA originally intended to consider only the 2022-2024 data, and it would not have been able to consider the 2025 design values if it had fulfilled its duty by the statutory deadline. *See* Dkt. No. 52-7 (2025 design values, published in June 2026). However, EPA does not adequately explain why it needs four months to accommodate new air monitoring data, let alone twelve months overall before sending out the 120-day letters.[16] Notably, (1) EPA initially anticipated it would have only eight months overall between the publication of the 2024 design values and the February 2026 promulgation, 2024 EPA Memo, Att. 1, only about one-and-a-half months less than EPA would have after publication of the 2025 design values if the Court ordered a 150-day deadline here; (2) "[i]n a prior PM2.5 designations process, EPA signed final designations just six months after design values are typically published," Dkt. No. 65 at 3 (discussing 2015 promulgation); and (3) "EPA here will be operating under court order, which requires EPA to devote additional resources to remedying its illegal delay," *id.*; *Citizens for Pa.'s Future v. Wheeler*, 469 F. Supp. 3d 920, 933 (N.D. Cal. 2020) ("EPA can—indeed, must—reallocate resources to the extent possible to satisfy its court-ordered deadlines.").

Second, EPA's other efforts to distinguish this process are conclusory. For example, EPA

---

[16] In fact, NGO Plaintiffs introduce evidence that there are 13 fewer counties exceeding the $PM_{2.5}$ standard under the 2025 design values than the 2024 design values, NGO Reply at 19, suggesting that developing designations will require less work than if EPA had needed to promulgate designations by February 2026.

United States District Court
Northern District of California

United States District Court
Northern District of California

asserts that it needs to "update other factual information and analytical tools relevant to EPA's determination of nonattainment area boundaries," but provides no explanation of what that means. Dkt. No. 62 at 3. EPA also asserts that "[t]he unprecedently stringent nature of the 2024 PM2.5 NAAQS will stretch the capabilities of existing analytical tools and require significant innovation by States and EPA." *Id.* EPA provides inadequate explanation of what "innovation" is required in the face of this lower threshold for nonattainment. *See also* Dkt. No. 65-3 ¶ 14 (testimony from CARB chief stating that "analyzing the relevant data and developing designations for the 2012 $PM_{2.5}$ NAAQS was similar in complexity and difficulty to the process for the 2024 $PM_{2.5}$ NAAQS"). EPA suggests that "a margin of error . . . is more important than ever given the low numerical threshold of the 2024 PM2.5 NAAQS in absolute terms." *Id.* EPA does not indicate why this translates to four months of time *just* for the initial review, and NGO Plaintiffs introduce evidence that concerns about inaccurate monitoring bias and margins of error were addressed as recently as 2024. Graham Decl. ¶ 16; Dkt. No. 65 at 9 (noting that EPA "updated its regulations governing the collection of monitoring data and the calculation of design values to address potential biases or errors in such data when it issued the 2024 standard").

Third, EPA still does not contend with Plaintiffs' persuasive evidence that much of the necessary data and designations have already been collected, and only a small number of areas need significant analysis. In addition to the evidence discussed above, Plaintiffs introduce evidence that "[o]nly 73 counties have [2025] design values that violate the" standards, and "thousands of counties do not violate the standard, are not located near an area that violates the standard, and can be readily determined to be in attainment." Dkt. No. 65 at 6 (citing Dkt. No. 52-8 ("Winz Supp. Decl.") ¶ 6). In addition, "states already recommended 23 of the 73 counties be designated nonattainment, and several of the 73 counties are adjacent, thus reducing the work needed to establish nonattainment area boundaries." *Id.* (citing Dkt. No. 65-2 ("Winz Second Supp. Decl.") ¶¶ 12–13). The five states that did not submit recommendations only contain 14 counties that violate the standard. Winz Second Supp. Decl. ¶ 15. Only nine states had indicated they intended to submit exceptional event demonstrations for the new year of data as of June 2026, and all but four counties within those states had 2025 design values below the standard and would

24

likely not need to be analyzed.  Winz. Supp. Decl. ¶¶ 13–14.  Further, "California—the state with the most nonattainment areas—does not anticipate submitting any exceptional events demonstrations for 2025."  State and Local Reply at 16 (citing Dkt. No. 54-1 ¶ 12).  Despite all this, EPA requests twelve months just to publish the initial designations and transmit the 120-day letters.

Fourth, many of EPA's assumptions are contradicted by evidence or seemingly inflated or redundant.  For example, EPA suggests it will need six months to draft and review technical support documents, Szabo July Decl. ¶¶ 9, 11, but NGO Plaintiffs introduce evidence that "EPA typically only issue[s] one consolidated technical support document for each state with a nonattainment area," meaning "EPA will only need to produce a limited number of technical support documents addressing only nonattainment or unclassifiable areas," Dkt. No. 65 at 6–7 (citing Winz Second Suppl. Decl. ¶¶ 8–11).  EPA suggests it will need two additional months after the 120-day notification period to review state feedback and finalize designations, Szabo July Decl. ¶¶ 15–17, despite the fact that it has promulgated designations within 120 days in the past. *Cf. Wheeler*, 469 F. Supp. 3d at 933 (rejecting schedule that "buil[t] in extra steps beyond those necessary to produce an environmentally sound and legally defensible rule," and noting that "additional rulemaking procedures beyond those required by law are a luxury that people exposed to hazardous . . . emissions can ill afford").[17]

Fifth, EPA argues that it faces several "mandatory competing obligations, including court-ordered consent decree deadlines and EPA's statutory deadlines to setting non-discretionary deadlines such as taking action on State Implementation Plan submissions."  Dkt. No. 62 at 6 (citing Szabo July Decl. ¶¶ 19–34).  Put differently, EPA seeks additional time to complete a non-discretionary duty it failed to meet until ordered to act by the Court, because it faces other court

---

[17] On top of this, EPA also asserts that it will need two months for "review of all documents and resolution of any remaining issues . . . and signature of the final *Federal Register* notice by the Administrator."  Szabo July Decl. ¶ 18.  The Court sees no reason why final review and a signature would take an additional two months, despite extensive review built in throughout the rest of EPA's proposed timeline, and despite the fact that EPA would be responding to this Court's order to act as expeditiously as possible.

orders to perform other unmet non-discretionary duties. While the Court may consider budgetary and manpower limitations, the Court finds EPA's self-inflicted challenges, by themselves, do not satisfy EPA's "especially heavy" burden. *See Thomas*, 658 F. Supp. at 172.[18]

All of these facts point to the same result: EPA has not met its heavy burden to demonstrate infeasibility or impossibility. *See Thomas*, 658 F. Supp. at 172; *cf. Cal. Cmtys. Against Toxics v. Pruitt*, 241 F. Supp. 3d 199, 206 (D.D.C. 2017) ("Absent an actual contention, backed by evidence, of 'impossibility,' the court will not accede to the agency's suggested timeline.").

This does not necessarily end the matter, as courts often find "it appropriate to order a regulatory schedule that is slightly more relaxed than that proposed by [the] plaintiff, but significantly more expedited than that sought by the defendant," rather "than order the defendant to do what is likely an impossibility." *See Johnson*, 444 F. Supp. 2d at 59 (observing that the plaintiff's proposed schedule was "simply too compressed" to afford a "reasonable possibility of compliance"); *Nat. Res. Def. Council, Inc. v. N.Y. State Dep't of Env't Conservation*, 700 F. Supp. 173, 181 (S.D.N.Y. 1988) (recognizing "the necessity of dealing with [compliance] issues on a pragmatic basis" and providing the Administrator with "a reasonable period of time" to comply with a mandatory statutory duty); *Thomas*, 658 F. Supp. at 175 ("Nevertheless, since the purpose of this order is to protect the public interest and not to punish EPA, the Court would extend EPA's time to compensate for its footdragging if it were convinced that doing so was necessary for the promulgation of workable regulations.").

Here, the Court finds that a slightly relaxed schedule is warranted. Plaintiffs provide substantial evidence that EPA should be able to promulgate designations within 120 days of sending the 120-day letters to states. But it is less clear that EPA is in a position to evaluate states' and Tribes' submissions in light of a new year of air monitoring data so as to be able to determine all of its initial designations within 30 days (and then send out the 120-day letters). While EPA

---

[18] NGO Plaintiffs also introduce persuasive evidence detailing why many of these competing priorities are discretionary or overstated. *See* Dkt. No. 65 at 4–5; Dkt. No. 65-2 ¶¶ 16–17; NGO Reply at 16 nn.8–9; *cf. Wheeler*, 330 F. Supp. 3d at 423 (crediting evidence that EPA was "engaging in a number of other discretionary activities"); *Johnson*, 444 F. Supp. 2d at 57 (same).

arguably could and should have done so earlier, the purpose of this order is not to punish the EPA, but rather to ensure that workable designations are transmitted. As a result, the Court finds that granting EPA until February 6, 2027, is warranted on this record. This will mean that EPA will have had roughly eight months since the time that the 2025 design values were published to promulgate the final designations—exactly what the EPA originally anticipated for the 2024 design values. *See* 2024 EPA Memo, Att. 1.

EPA's duty to promulgate under 42 U.S.C. § 7407(d)(1) requires the Administrator to do so via notice in the Federal Register. 42 U.S.C. § 7407(d)(2). As a result, the Court's order will give EPA a deadline for promulgation *and* publication on the Federal Register. The Court recognizes that "EPA has no control over the publication schedule at the Office of the *Federal Register*." Opp. at 23. But "[w]hile the EPA cannot itself control the Federal Register publication schedule, the agency has sufficient institutional experience to deduce when it would need to transmit a determination for publication in order to meet, with reasonable certainty" the Court's order. *Wheeler*, 2019 WL 9464390, at *3.

The Court will not explicitly order an intermediate deadline upon which the Administrator must provide states with the 120-day letters, as NGO Plaintiffs request. However, EPA is statutorily required to notify a state whenever it intends to make a modification to the state's proposed designations, and it must "give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto." 42 U.S.C. § 7407(d)(1)(B)(ii). As a practical matter, then, EPA will either need to (1) notify a state 120 days before promulgating designations it intends to modify; or (2) accept the state's designations without modification. Failure to take one of these actions will risk non-compliance with this order.

### iii.    Effective Date

NGO Plaintiffs additionally ask the Court to order EPA to promulgate "immediately effective" designations. NGO Mot. at 22. They argue that "[w]hile some implementation deadlines are dependent on the exact date of designations[,] . . . others are based on the calendar year that designations occur," and "were the designations promulgated in the Federal Register and

United States District Court
Northern District of California

effective on or after January 1, 2027, the attainment deadline would be pushed back an entire year." *Id.* at 28. EPA argues that "the only mandatory duty at issue here is EPA's duty to promulgate designations, and NGO Plaintiffs have not provided any basis for their request that the Court order EPA to make the designations effective immediately." Opp. at 21. EPA notes that some other CAA provisions require specific effective dates, but the relevant provisions here do not. *Id.* (citing 42 U.S.C. § 7411(b)(1)(B)).

The Court agrees with EPA. The CAA does not set forth a specific date by which the agency must make designations effective. The statute also does not expressly equate the Administrator's duty to promulgate with a duty to make designations effective. In *WildEarth Guardians v. McCarthy*, the Ninth Circuit recognized from its earlier cases a "clear statement rule":

> When a plaintiff sues the EPA Administrator for failure to perform any act or duty under this chapter which is not discretionary with the Administrator, 42 U.S.C. § 7604(a)(2), we have held that the nondiscretionary nature of the duty must be clear-cut—that is, readily ascertainable from the statute allegedly giving rise to the duty. We must be able to identify a specific, unequivocal command from the text of the statute at issue using traditional tools of statutory interpretation; it's not enough that such a command could be teased out from an amalgamation of disputed statutory provisions and legislative history coupled with the EPA's own earlier interpretation.

772 F.3d 1179, 1182 (9th Cir. 2014) (internal quotations and citations omitted); *see Our Children's Earth Found. v. U.S. EPA*, 527 F.3d 842, 851 (9th Cir. 2008) (construing the Clean Water Act's citizen-suit provision similarly). The Court has previously applied this reasoning when denying a request to make similar ozone designations effective immediately. *See also In re Ozone*, 286 F. Supp. 3d at 1091.

The Court recognizes that this case is different in some regards from *In re Ozone*, since "an immediate effective date in this litigation could prevent attainment deadlines from being pushed back by an entire calendar year." NGO Reply at 23 (emphasis omitted); *see also* 42 U.S.C. § 7513(c) (tying attainment dates to "end of the sixth calendar year after the area's designation as nonattainment"). The Court acknowledges the potential harms from any delay. But the Court remains unconvinced that it has the authority under *McCarthy* to issue the injunction NGO

28

Plaintiffs seek, even given NGO Plaintiffs' citations about the broad discretion the Court has to craft an equitable remedy, *see* NGO Reply at 23.  NGO Plaintiffs cite a handful of non-binding district court cases that ordered a specific effective date in comparable circumstances, but two pre-dated *McCarthy* and *Our Children's Earth Foundation*, and none of them spent significant time analyzing the propriety of such injunctive relief.  Perhaps more importantly, the practical import of the Court's decision to grant additional time to EPA is that the EPA will already have until early 2027 to promulgate the designations, even if the Court granted Plaintiffs' requested relief.

To the extent that other CAA provisions could theoretically be delayed by granting EPA's request on this point, that risk is addressed by EPA's commitment that it "anticipates that it would establish an effective date of 30 to 60 days following promulgation of the designations in the *Federal Register*."  Szabo June Decl. ¶ 41.  The Court would consider whether a further order is necessary if it fails to do so.

## V.   CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motions for summary judgment, Dkt. Nos. 16 in Case No. 4:26-cv-03118 and 40 in Case No. 4:26-cv-03500-HSG.  The Court **DENIES** Defendant's motion for abeyance, Dkt. No. 31 in Case No. 4:26-cv-03118.

The terms of the judgment are as follows:

(1) The Court **DECLARES** that Defendant Lee Zeldin, in his official capacity as Acting Administrator of the U.S. Environmental Protection Agency, has failed to perform non-discretionary duties imposed by 42 U.S.C. § 7407(d)(1)(B)(i) to promulgate by February 7, 2026, area designations for all areas of the country under the 2024 NAAQS for $PM_{2.5}$; and

(2) The Court **ORDERS** Defendant to promulgate final designations for all areas of the country no later than February 6, 2027;

The Clerk is **DIRECTED** to enter judgment in both cases in favor of Plaintiffs and against Defendants and close both cases.  The Court retains jurisdiction to make such orders as may be necessary or appropriate.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: July 17, 2026

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge